## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**CEDAR LODGE PLANTATION, LLC,**                    CIVIL ACTION
**ET AL.**

**VERSUS**

**CSHV FAIRWAY VIEW I, LLC, ET AL.**          NO.: 13-00129-BAJ-EWD

<u>RULING AND ORDER</u>

Before the Court are several motions, including a **Motion for Partial Summary Judgment (Doc. 123)** filed by Cedar Lodge Plantation, LLC ("Cedar Lodge"), a **Motion for Summary Judgment (Doc. 120)** filed by Defendant Sewer Treatment Specialists, LLC ("STS"), a **Motion for Summary Judgment or, Alternatively, a Motion for Partial Summary Judgment (Doc. 121)** filed by defendants CSHV Fairway View 1, LLC, CSHV Fairway View II, LLC, and Campus Advantage (collectively, "Fairway View"), and **Fairway View's Motion to Strike the Declarations of Phillips Witter (Doc 138-12) and Suresh Sharma (Doc 138-2) (Doc. 142)**. All parties filed responses (Docs. 138, 139, 140, 154, 165) and replies (Docs. 147, 160) where applicable. The Court has jurisdiction pursuant to 28 U.S.C. § 1332. The Court held oral argument on the motions on November 28, 2016.

## I.    BACKGROUND

Cedar Lodge owns property directly adjacent to and abutting Fairway View Apartments ("the Apartment Complex") located at 2225 College Drive, Baton Rouge, Louisiana, which is owned by Fairway View. (Doc. 50 at ¶¶ 2, 5). Cedar Lodge alleges

1

that STS is the service contractor for the Apartment Complex's wastewater lift station and water treatment system. (*Id*. at ¶ 7). Cedar Lodge further alleges that, because of the negligence of Fairway View and STS, Defendants are liable for "the continuous unpermitted discharge of harmful or hazardous substances, pollutants and/or contaminants [from the Apartment Complex], including but not limited to raw sewage onto Plaintiffs' property."[1] (Doc. 50 at ¶ 9). Specifically, Cedar Lodge alleges, *inter alia*, that waterways, groundwater, and soil on its property have been contaminated, which has caused the property to be unsuitable for use, development, and/or sale. (*Id*. at ¶ 20). As this litigation has progressed, it is clear that the focal point of the alleged contamination is a pond on Cedar Lodge's property, which receives run-off from a drainage ditch located on the Apartment Complex lot. Cedar Lodge prays for relief in the form of damages, including the cost of remediation and repair, diminution of property value, loss of use and enjoyment of property, lost business opportunity and/or lost profits, plus interest, statutory penalties, attorney's fees, and costs and expenses. (*Id*. at ¶ 25).

---

[1] The initial petition filed in state court specified that suit was brought individually and on behalf of a class of similarly situated persons, invoking La. C.C.P. art. 591 as the vehicle for class certification. (Doc. 1-5 at pp. 3, 8). In this Court, the Magistrate Judge permitted Plaintiff a period of time to determine whether the case should proceed as a class action. (Doc. 58 at pp. 1–2). On June 8, 2015, the Court dismissed without prejudice all class action claims and allegations, upon motion by Plaintiff. (Doc. 67). Nonetheless, federal jurisdiction remains proper, for the Court assesses its jurisdiction as it existed at the time of removal. In the instant case, the U.S. Court of Appeals for the Fifth Circuit has issued a ruling overturning this Court's decision to remand the matter to state court, unambiguously declaring that "the time-of-removal rule prevents post-removal actions from destroying jurisdiction that attached in a federal court under CAFA." (Doc. 39 at p. 5). "[F]federal jurisdiction under the statutory provision of CAFA is explicitly concerned with the status of an action when filed—not how it subsequently evolves." *Louisiana v. Am. Nat. Prop. Cas. Co.*, 746 F.3d 633, 639 (5th Cir. 2014). The instant civil action was filed under the state rule of civil procedure authorizing a class action. *See* 28 U.S.C. § 1332(d)(1)(B). Hence, jurisdiction under the CAFA statute remains proper although subsequent post-removal actions rendered this case a non-class action.

## II.   MOTION TO STRIKE

After the parties filed their respective motions for summary judgment, Fairway View filed a motion to strike the declarations of Mr. Suresh Sharma, Cedar Lodge's environmental expert, and Mr. Phillips Witter, Cedar Lodge's corporate representative, both of which Cedar Lodge attached to its response to Fairway View's motion for summary judgment. (Doc. 142). In its motion, Fairway View argues that both Mr. Witter and Mr. Sharma make statements in their respective declarations that contradict their previous deposition testimony and can therefore not be used as evidence to create a genuine issue of material fact. Because of this, Fairway View asks that the Court strike the declarations in their entirety or, at the very least, strike certain paragraphs of their declarations. (Doc. 142 at p. 1).

As a general rule, "a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition." *Kennett-Murray Corp. v. Bone*, 622 F.3d 887, 893 (5th Cir. 1980) (citing *Camerlin v. New York Central R. Co.*, 199 F.2d 698, 701 (1st Cir. 1952)). The law of the U.S. Fifth Circuit provides, however, that a party may not create a genuine issue of material fact with an affidavit that contradicts prior deposition testimony. *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 136-37 n. 23 (5th Cir. 1992); *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 233 n. 9 (5th Cir. 1984); *Hardesty v. Cochran*, 621 Fed. Appx. 771, 778 (5th Cir. 2015) ("This court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony."). The Court will not consider such

3

an affidavit unless either of two exceptions apply: the affidavit must sufficiently explain the reasons for the contradiction, or else, the deposition itself must demonstrate that the affiant was confused while giving his earlier testimony. *See, e.g., Kennett-Murray Corp.*, 622 F.2d at 894. Further, "[w]hen an affidavit merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996) (citing *Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir. 1988)). An affidavit permissibly supplements earlier deposition testimony if it merely "clarifie[s] or amplifie[s] the facts by giving greater detail or additional facts not previously provided in the deposition." *Id*. By contrast, if the affiant "was thoroughly questioned" about the issue at the deposition and answered the questions "unequivocal[ly]," contradictory averments in the subsequent affidavit will not create a genuine dispute of material fact. *Doe v. Doe*, 220 F.3d 380, 386 (5th Cir. 2000) (citing *Clark*, 854 F.2d at 766–67).

## A.   PARAGRAPH 4 OF THE WITTER DECLARATION

In Paragraph 4 of his declaration, Mr. Witter enumerated specific details concerning a development project he was negotiating on behalf of Cedar Lodge at the time he discovered the alleged contamination. (Doc. 142-1 at p. 3). Specifically, the statements in the declaration highlight key dates and facts that Fairway View argues Mr. Witter was previously unable to recall during his deposition, including the statement that most "studies, plans and budgets [concerning the development project] were complete by [early December 2012]," and that Cedar Lodge and Harvest

Partners "were about to sign the formal letter of intent the next month, January 2013." (*See* Docs. 138-12 at p. 2, 142-1 at p. 3). During his deposition Mr. Witter was unable to recall many pertinent-but-specific facts relevant to the progression of Cedar Lodge's development project with Harvest Partners at the time of the alleged contamination. (*See* Doc. 138-6 at pp. 20 – 24). Despite the apparent inconsistency, the Witter declaration does not introduce information that is new, different from or wholly inconsistent with that given by Mr. Witter during his deposition.  Instead, Mr. Witter's declaration permissibly amplifies facts that were previously hazy but were otherwise available elsewhere in the record.

Fairway View relies on the Fifth Circuit's holding in *McCulley v. JTM Industries, Inc.* to support its contention that Paragraph 4 of Mr. Witter's declaration should be stricken. In *McCulley*, the court found that "supplementary" statements made by the plaintiff were not competent summary judgment evidence because many of the plaintiff's answers "purport[ed] to reflect knowledge of persons and events that, at the time of his deposition, he vigorously maintained he either did not know or did not recall." *McCulley*, 116 F.3d 1477, 1997 WL 304208, at *2 (5th Cir. 1997).  On that basis, the Fifth Circuit found that the characterization of the plaintiff's affidavit as supplementary would be "optimistic" but incorrect. *Id.* at *2. Here, however, it would be inaccurate to classify Mr. Witter's statements in Paragraph 4 of his declaration as anything other than supplementary. That is, all of Mr. Witter's deposition testimony indicates that between the end of 2012 and the beginning of 2013, the negotiations to develop the Cedar Lodge property were still ongoing and, given Mr. Witter's

testimony about the fluid nature of real estate transactions, his post-deposition supplementation of the facts as he recalled them was both consistent and permissible. Accordingly, despite this variation in Mr. Witter's testimony, the Court **DENIES** the motion to strike and will allow the jury to assess his credibility should the inconsistency be raised at trial.

### B.   PARAGRAPHS 5 AND 11 OF THE WITTER DECLARATION

Paragraphs 5 and 11 of Mr. Witter's declaration concern his personal observations of the alleged flow of raw sewage into the Cedar Lodge pond. In Paragraph 5 of his declaration, Mr. Witter asserts that he saw raw sewage streaming out of a ditch into the Cedar Lodge pond in December 2012, and that said raw sewage was very obviously coming from the Apartment Complex. (Doc. 142-1 at p. 5). Paragraph 11, Mr. Witter states that he "saw raw sewage pouring out from the Fairway View ditch into the Cedar Lodge pond" in February 2013. (Doc. 142-1 at p. 6). Fairway View asserts that these statements contradict Mr. Witter's deposition testimony regarding his observations of the ditch near the Cedar Lodge pond. Specifically, Fairway View asserts that Mr. Witter's deposition testimony does not explicitly state that he *saw* "raw sewage" running from Fairway View's property to the pond. (Doc. 142-1 at p. 7). Instead, Mr. Witter purported to see "clear water" streaming onto the ditch and further stated that the stench at the pond was bad, thus confirming his ability to smell the alleged contamination. (Doc. 142-1 at pp. 5 – 6). However, at no point during his deposition did Mr. Witter affirmatively state that he saw raw sewage streaming into the Cedar Lodge pond, nor was he able to confirm a

source for the alleged raw sewage. As such, the statements in Paragraphs 5 and 11 of the Witter declaration, specifically, those portions in which Mr. Witter states he saw raw sewage streaming out of a ditch into the Cedar Lodge pond, are **STRICKEN**.

### C.   PARAGRAPHS 8 AND 10 OF THE SHARMA DECLARATION

Fairway View also objects to Paragraphs 8 and 10 of the Mr. Sharma's declaration, in which he made statements regarding the source of the contaminants ("raw sewage") found in the Cedar Lodge pond.[2] (Doc. 142-1 at p. 7 – 11). These statements do not directly contradict Mr. Sharma's deposition testimony regarding the source of the contaminants. Particularly, in his deposition testimony, Mr. Sharma never indicated that he witnessed firsthand raw sewage entering the Cedar Lodge pond, nor did he conclusively determine that the contaminants flowed from the Apartment Complex to the Cedar Lodge pond. Rather, he indicated that the direction from which water drains into the pond led him to conclude that the contaminants flowed from the Apartment Complex and/or the golf course to the west of the pond, both of which were potential contributors to the ditch through which water flowed onto Cedar Lodge's property. Although the declaration creates some slight inconsistency in Mr. Sharma's testimony in that it purports to conclusively identify the source of the alleged contamination, as opposed to what the directional flow of the alleged contamination indicated the source might be, this does not amount to a

---

[2] Specifically, in Paragraph 8 of the declaration, Mr. Sharma states: "When raw sewage enters the Cedar Lake (sic) pond from the Fairway View ditch, some of the raw sewage and discharge waste settles into the pond bottom, and some of it eventually leaks out into Ward Creek on the other side of the pool." Paragraph 10 of the declaration states: "Raw sewage and waste has, more likely than not, built up in the pond bed from the intermittent discharges of raw sewage and waste from the Fairway View apartments."

7

contradiction warranting exclusion from consideration in determining whether genuine fact issues remain. As such, the statements in Paragraphs 8 and 10 of the Sharma declaration are **NOT STRICKEN**.

## D.   PARAGRAPH 11 OF THE SHARMA DECLARATION

In Paragraph 11 of his declaration, Mr. Sharma stated that the low fecal coliform values in the Cedar Lodge pond in March 2015 was likely due to the fact that "there had been no significant rain immediately prior to that and because the sample was taken from the far east pond, farthest from the Fairway View ditch." (Doc. 142-1 at p. 11). Fairway View objects on the basis that Mr. Sharma's report was not based on samples taken after heavy rainfall and he is thus unable to make statements as to the effect that the lack of rain had on the amounts of fecal coliform found in the pond sample. (Doc. 142-1 at p. 11). Mr. Sharma's statement, however, is not an addition or contradiction, as Mr. Sharma's deposition testimony explicitly stated that the concentration of contaminants, including fecal coliform, "depends at what time of the year the samples are collected, what kind of rain impact, rainfall discharge that happens that washes out some of those heavy metals from some of those sample locations." (Doc. 138-3 at p. 60). To the extent Fairway View objects to the speculative nature of Mr. Sharma's conclusion because he failed to produce concrete evidence demonstrating the lack of rain prior to collecting the pond sample, Fairway View may emphasize this on cross-examination and allow the jury to determine the credibility of his testimony on this point. Because Mr. Sharma's deposition testimony and

declaration statements are sufficiently consistent, the statements in Paragraph 11 of Mr. Sharma's declaration are **NOT STRICKEN**.

## III.   MOTIONS FOR SUMMARY JUDGMENT

### A.   SUMMARY JUDGMENT STANDARD

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether the movant is entitled to summary judgment, the court views the facts in the light most favorable to the non-movant and draws all reasonable inferences in the non-movant's favor. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

After a proper motion for summary judgment is made, the non-movant "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal citations omitted). At this stage, the court does not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir.1991), *cert. denied*, 502 U.S. 1059 (1992). However, if "the evidence in the record is such that a reasonable jury, drawing all inferences in favor of the non-moving party, could arrive at a verdict in that party's favor," the motion for summary judgment must be denied. *Id.* at 1263.

On the other hand, the non-movant's burden is not satisfied by some metaphysical doubt as to the material facts, or by conclusory allegations,

unsubstantiated assertions, or a mere scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (internal quotations omitted). Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, summary judgment will lie only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Sherman v. Hallbauer*, 455 F.2d 1236, 1241 (5th Cir. 1972).

## B.   CEDAR LODGE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### 1.   Cedar Lodge's Argument

Cedar Lodge argues that "defendants" have conceded that the Apartment Complex was discharging sanitary sewer waste onto its property.[3] (Doc. 123-1 at p. 1). Cedar Lodge therefore requests that the Court "narrow the factual issues for trial because the defendants' own inculpating documents and the uncontested facts demonstrate that there was a breach when the defendants failed to prevent their sewage from discharging on the plaintiff's property." (*Id*. at p. 3).

Cedar Lodge's argument rests upon its assertion that "the undisputed evidence demonstrat[es] that discharges from the Fairway View apartment complex's sanitary

---

[3] By way of reference, generally, to "defendants," it is unclear if the arguments raised in Cedar Lodge's motion apply to Fairway View, STS, or both. For instance, Plaintiff states that "defendants failed to prevent *their* sewerage (sic) from discharging onto Plaintiff's property." (Doc. 123-1 at p. 1) (emphasis added). STS is not alleged to have owned the Apartment Complex, the property upon which it rests, or the sewerage facility it serviced.

sewerage system have contaminated" its property. (*Id*. at p. 2). To support this assertion, Cedar Lodge relies upon, *inter alia*: (1) service calls and maintenance requests from residents of the Apartment Complex (*id*. at pp. 5 – 7, ); (2) the affidavit of Jeffrey Spurlock, a resident of the Fairway View Apartments (*id*. at pp. 8 – 9); (3) the reports of two of its expert, Ronald K. Ferris and Sidney Marlborough (*id*. at pp. 9 – 11); (4) a letter from STS to Fairway View indicating the directional flow of sewage discharge (*id*. at p. 9); and (5) shortcomings contained in the report of Fairway View's expert, Roy M. Carubba (*id*. at p. 10).

2.    Defendants' Responses

STS and Fairway View argue that the service calls and maintenance requests relied upon by Cedar Lodge do not establish that discharged sewage migrated to Cedar Lodge's property. (Doc. 129 at pp. 4 – 11; Doc. 135-2 at pp. 2 – 8). Similarly, STS argues that Mr. Spurlock's affidavit does not establish that the discharged sewage he witnessed ultimately migrated to Cedar Lodge's property, or that contamination resulted therefrom. (Doc. 135-2 at p. 9). Lastly, STS and Fairview assert that there is conflicting expert testimony as to whether Cedar Lodge's property is currently contaminated, was formerly contaminated, and whether any such contamination was caused by sewage discharge from the Apartment Complex, as opposed to other properties or area wildlife. (Doc. 129 at pp. 14 – 15; Doc. 135-2 at pp. 9 – 14).

3.   Analysis

At one point, Cedar Lodge asserts that the Court can "narrow the causation fact issues to be handled at trial by ruling that Fairway View apartment complex's sanitary sewer did indeed discharge waste on the plaintiff's property." (Doc. 123-1 at p. 3). On the same page, Cedar Lodge then requests that the Court "narrow the factual issues for trial because . . . the uncontested facts demonstrate that there was a *breach* when the defendants failed to prevent their sewage from discharging on the plaintiff's property." (*Id.*) (emphasis added).

It is unclear whether Cedar Lodge seeks a finding on liability as to both Fairview and STS, or whether Cedar Lodge seeks a finding on the issue of causation or breach. The lack of clarity aside, the Court finds that Cedar Lodge has not established as an undisputed fact that discharged sewage migrated from the Apartment Complex to its property. Likewise, the Court finds that Cedar Lodge has not established as an undisputed fact that discharged sewage from the Apartment Complex caused—or was a substantial factor in causing—any past or current contamination of its property. The weight of the evidence relied upon by Cedar Lodge in its motion establishes only that sewage was discharged on Fairway View's property. Although Mr. Marlborough states that his samplings "indicate that sanitary discharge from Fairway View has impacted Cedar Lodge's lake," (Doc. 123-31 at ¶ 8), STS draws the Court's attention to the testimony of Cedar Lodge's other expert, Suresh Sharma, who could not rule out alternative sources as the cause of any contamination on Cedar Lodge's property, (Doc. 135-4 at pp. 111 – 115, 256 –

257). Even though Cedar Lodge's evidence may provide a more plausible explanation for the alleged contamination it has identified, this is a controverted issue that must be resolved at trial. For these reasons, Cedar Lodge's motion for partial summary judgment is **DENIED**.

### C.   STS'S MOTION FOR SUMMARY JUDGMENT

#### 1.   STS's Argument

STS argues that Cedar Lodge has failed to produce evidence showing that: (1) it knew of sewage discharges onto Cedar Lodge's property from the Apartment Complex, or (2) it had a contractual or legal duty to monitor or correct alleged problems with the Apartment Complex's sewerage system that were the source of any contamination at issue. (Doc. 120 at p. 1). Because of the limited scope of its contract with Fairway View, STS argues that it was under no contractual or legal duty "to monitor or repair the sewerage system at Fairway View Apartments" or "correct any alleged problems with the sewer system of the Fairway View Apartments."[4] (*Id*. at p. 7).

Although not stated explicitly, STS also argues that there is no evidence that it breached any duty it may have owed to Cedar Lodge. (*Id*. at p. 2) (stating that "Plaintiff has not produced evidence of liability of STS . . . "). STS asserts that Mr. Ferris is the only expert that has testified regarding its conduct. (*Id*. at pp. 4 – 5). In

---

[4] Near the very end of its motion, STS cites *Coleman v. Otis Elevator Co.*, 582 So.2d 341 (La. App. 4 Cir. 1991) and *Smith v. Cutts*, 99 – 253 (La. App. 3 Cir. 03/15/00); 759 So.2d 851 for the proposition that "[u]nder Louisiana law, a maintenance contractor must merely exercise reasonable care under the circumstances." (Doc. 120-2 at p. 6).

STS's view, Mr. Ferris's report indicates that it performed its obligations under the contract, and that it had no legal duty to prevent discharged sewage from migrating to Cedar Lodge's property. (*Id*.).

### 2.   Cedar Lodge's Response

Cedar Lodge asserts that the existence of a duty is a question of law. Cedar Lodge cites the two cases[5] relied upon by STS in its motion and argues that STS had a duty to exercise reasonable care under the circumstances. Cedar Lodge argues that it has cited sufficient summary judgment evidence to create a factual dispute as to: (1) whether STS knew or should have known that sewage was discharging from the Apartment Complex onto its property, and (2) whether STS unreasonably delayed repairs or carried out faulty repairs on Fairway View's sewerage system, including the lift station that it contracted with Fairway View to maintain. (Doc. 131-1 at pp. 7 – 11).

### 3.   Analysis

#### a.   *Duty and Scope of Duty*

The essence of STS's motion is that it owed no duty to Plaintiff. (*See generally* Doc. 120). Because Cedar Lodge has no contractual relationship with STS, any cause of action against it must arise in tort under general negligence principles.[6] To

---

[5] *See* note 6, *supra*.

[6] Plaintiff does not argue that it was a third party beneficiary of the contract between STS and Fairway View. Nonetheless, the Court notes that "[t]he most basic requirement of a stipulation *pour autrui* is that the contract manifest a clear intention to benefit the third party; absent such a clear manifestation, a party claiming to be a third party beneficiary cannot meet his burden of proof." *Joseph v. Hosp. Serv. Dist. No. 2 of Par. of St. Mary*, 05—2364, p. 9 (La. 10/15/06); 939 So.2d 1206, 1212. The Court finds that the contract between STS and Fairway View does manifest a clear intent to benefit Plaintiff. (*See* Doc. 131-4 at p. 2).

determine whether to impose liability under Louisiana Civil Code Article 2315, Louisiana courts employ a duty-risk analysis, whereby a plaintiff must establish the following five elements: "(1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element)." *Adler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008); *Lemann v. Essen Lane Daiquiris*, 05-1095, p.7 (La. 03/10/06); 923 So.2d 627, 633). "A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability." *Mathieu v. Imperial Toy Corp.*, 94-0952, p.11 (La. 11/30/94); 646 So.2d 318, 326.

The parties cite *Coleman* and *Smith* for the proposition that maintenance and repairmen have a duty to exercise reasonable care. (Doc. 120 at p. 6; Doc. 131-1 at pp. 3 & n.2, 12 & n.60). The Court agrees that STS was under a legal duty to: (1) exercise reasonable care in operating and maintaining Cedar Lodge's sewerage lift station within the terms of its contract with Fairway View and (2) exercise reasonable care in conducting any ancillary repairs it undertook on Plaintiff's sewerage treatment system.[7] *See Campbell v. Otis Elevator Co.*, 808 F.2d 429, 434 (1987) (compiling cases

---

[7] The contract between STS and Fairway View provided, in pertinent part:

STS agrees to operate & maintain the client's wastewater lift station(s), located at the above address, on a Service Frequency of ONCE PER MONTH in accordance with the terms and conditions as follows:

and instructing that Louisiana courts "requir[e] a maintenance contractor, like any repairer, only to exercise reasonable care under the circumstances"); *see also Williams v. La. Mach. Co.*, 387 So.2d 8, 12 (La. App. 3 Cir. 5/21/80) ("A repairer has a duty, arising in tort, to exercise reasonable care and skill in the design and repair of the object to be repaired commensurate with the risk of harm flowing from the normal use of that product.").

The scope of protection inquiry assumes the existence of a duty, and "questions whether the injury the plaintiff suffered is one of the risks encompassed by the rule of law that imposed the duty." *Roberts v. Benoit*, 605 So.2d 1032, 1044 (La. 1991), *on*

---

In accordance with the above stated Service Frequency, the following tasks will be performed by STS on the client's wastewater lift station and waste water treatment system:

1. Inspect all controls, wiring and control enclosure for weather leaks or damage.
2. Inspect the operation of the simplex, duplex and triplex pump system(s).
3. Inspect vibration pump(s) and/or motor(s).
4. Inspect the belts/couplings and tighten bolts on pump(s) and motor(s) when applicable.
5. Check the oil levels in the gearboxes. Inspect and lubricate the pump(s) and motor(s) when applicable.
6. Wash down lift station/plant according to the inspection frequency. In order to guarantee this service, the client must provide clean water service and hoses near the station.
7. Inspect the outer piping of the lift station for possible leaks or damage.
8. Inspect and check the floor of the lift station for silt or debris with a probe.
9. Wash down the area around the lift station pad.
10. Observe for erosion to the inner well/tank area.
11. Check amps on all motor(s) and pump motor(s).
12. Inspect the high-level alarm.
13. Test all H-O-A switches.
14. Check external effluent lift station condition.
15. Manually check for complete operation, through simulation, where lift station can/well is easily entered.
16. Check lift station for infiltration.

\* \* \*

NOTE: Additional Emergency call outs will be billed as (call out); the charges will be billed as time/rate. Once we get to client's site, the operator will call the client with a flat rate to make the repair with a built in minimum of 2.5 hours at $75.00 per hour.

\* \* \*

(Doc. 131-4 at p. 2).

*reh'g*, (May 28, 1992). "In short, the scope of protection inquiry asks whether the enunciated rule or principle of law extends to or is intended to protect *this plaintiff* from *this type of harm* arising in *this manner*." *Id*. at 1044 – 1045 (internal quotations omitted) (emphasis in original). To determine whether STS owed a duty to Cedar Lodge, the Louisiana Supreme Court articulated the following test:

> In determining whether to impose a duty in a particular situation, the court may consider various moral, social, and economic factors, including whether the imposition of a duty would result in an unmanageable flow of litigation; the ease of association between the plaintiff's harm and the defendant's conduct; the economic impact on society as well as the economic impact on similarly situated parties; the nature of the defendant's activity; moral considerations, particularly victim fault; and precedent as well as the direction in which society and its institutions are evolving.

*Meany v. Meany*, 94-0251, p. 6 (La. 7/5/94); 639 So.2d 229, 233 (citing *Pitre v. Opelousas General Hospital*, 530 So.2d 1151, 1161 (La. 1988); William E. Crow, *The Anatomy of a Tort*, 22 Loy.L.Rev. 903 (1976)). Applying these factors to the instant case, the Court finds that STS's duty under these circumstances encompassed the risk of harm that an adjacent landowner, like Cedar Lodge, may incur property damage from discharged sewage occasioned by sub-standard conduct. That is, because the breach of STS's contractual duty to maintain the lift station may result in harm to adjacent properties, STS owed an extra-contractual duty to Cedar Lodge to act reasonably in maintaining the sewer lift station.

       b.   Breach

Having disposed of STS's argument related to the existence *vel non* of a duty, the Court addresses STS's assertion that there is no evidence that indicates it was

negligent. It is insufficient for Cedar Lodge to simply show that STS knew or should have known that sewage was discharging from the Apartment Complex, and that the sewage had the potential to migrate to its property. Rather, Cedar Lodge must point to facts demonstrating that STS failed to exercise reasonable care when it carried out its responsibilities under its contract with Fairway View, or that it failed to exercise reasonable care when it performed other repairs with the acquiescence of Fairway View.[8]

Plaintiff draws the Court's attention to specific instances when the lift station at the Apartment Complex did not work properly, along with instances where sewage discharge was reported to STS. (Doc. 131-1 at pp. 8 – 11). Cedar Lodge also asserts that STS gave a quote to Fairway View to replace one of the lift station's pumps, but it "appears" that the work was not done "until later in the month."[9] (Doc. 131 at p. 9). While the lift station may have required multiple repairs within a short timeframe, the Court finds that Cedar Lodge does not point to any evidence to suggest that STS failed to exercise reasonable care. That is, Cedar Lodge does not point to specific evidence to suggest that STS's repairs were faulty, that STS caused or contributed to the possible failures of the lift station, or that STS otherwise caused or contributed

---

[8] The Court affords little weight to Plaintiff's reliance on *Trtanj v. City of Granite City*, 379 Ill. App .3d 795, 884 N.E.2d 741 (2008). In *Trtanj*, the court held that summary judgment was inappropriate because there was a factual dispute relative to the timeliness of the city's action to set up a bypass pump when a storm cut power to the city's sewerage lift station. *Id*. Unlike the city in *Trtanj*, STS did not own or control Fairway View's sewerage treatment system, including the lift station. Furthermore, unlike the situation in *Trtanj*, Plaintiff has not identified a specific problem with the lift station that (1) STS was negligent in creating or (2) STS was negligent in correcting.

[9] Cedar Lodge does not state when Fairway View approved the work.

18

to any routine blockages in Fairway View's sewerage system that may have resulted in discharged sewage.

This finding is buttressed by the report of Cedar Lodge's expert, Mr. Ferris, who opines that "it should be obvious that many (most) of the problems occurring repeatedly were not correctable using maintenance methodologies." (Doc. 131-15 at p. 7). Mr. Ferris further states that stoppages resulting in sewage discharges were "due to the deplorable conditions of the system—further evidence that 'maintenance' methodologies and procedures are only short-term, ineffectual band aids." (*Id*. at p. 13). Later in his report, Mr. Ferris states that discharges were "an on-going problem . . . and will continue to be a problem until a permanent repair to the system is effected. To be completely adequate and effective, those repairs must involve a complete replacement of the entire collection system, including an alternative configuration and replacement of piping and pump station." (*Id*.). Finally, Mr. Ferris remarks that because "this is a private system owned and operated by Fairway View, that replacement would necessarily be their responsibility and expense."[10]

Considering Mr. Ferris's testimony, there is no evidence that Fairway View authorized STS to replace the sewer system or perform any such repairs that he opines were required to prevent sewage discharges. Likewise, there is no evidence that STS prevented Fairway View from discovering the problems described by Mr.

---

[10] Although Mr. Ferris states that the need for STS to repair the lift station four times in a short span "indicate[s] that corrections were not adequately addressed during the alleged repairs," he does not explain how STS acted unreasonably or opine as to what it should or could have done differently under the circumstances. (Doc. 131-15 at p. 7).

Ferris. Lastly, there is no evidence that STS failed to exercise reasonable care when it made repairs or carried out its obligations under its contract with Fairway View. That STS serviced the lift station on several occasions and responded to maintenance calls, without more, does not create a genuine dispute of fact that it acted negligently. For these reasons, STS's motion for summary judgment is **GRANTED**.

### D. FAIRWAY VIEW'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, MOTION FOR PARTIAL SUMMARY JUDGMENT

In its motion, Fairway View offers that Cedar Lodge has failed to provide evidence in support of an essential element of its negligence claim, namely, damages. Specifically, Fairway View contends that Cedar Lodge has not provided evidence demonstrating that it has a compensable claim for restoration or remediation of its property or for loss of a business opportunity. (Doc. 121-1 at pp. 1 – 2). The availability of each of these forms of damages is discussed below.

1. Remediation

Fairway View asserts that Cedar Lodge has not provided any evidence demonstrating that its property is currently damaged and therefore requires restoration or remediation.[11] (Doc. 121-1 at pp. 4 – 8). In support of this contention, Fairway View cites: (1) deposition testimony of Plaintiff's corporate representative, Mr. Witter, indicating that remediation is not necessary and that any alleged pollution of its pond has dissipated (Doc. 121-1 at p. 5); (2) an interrogatory response in which Cedar Lodge admits that damage to the pond has dissipated; and (3) the

---

[11] Fairway View assumes, for the purpose of its motion only, that raw sewage from its property migrated to Cedar Lodge's property. (*Id*. at pp. 1 n.1, 4).

most recent expert report of Cedar Lodge's environmental expert, Suresh Sharma, in which he concluded that the subject pond was not contaminated. (*Id*. at pp. 6 – 8). Fairway View further relies on *Carr v. Oake Tree Apartments*, 786 So.2d 230 (La. App. 2 Cir. 5/9/01), to argue that Cedar Lodge cannot establish a claim for remediation damages because it has no proof that the pond is currently contaminated or that remediation is needed to mitigate any past contamination. (Doc. 121-1 at pp. 6 – 8).

Cedar Lodge disagrees with Fairway View's representation of the evidence and offers expert testimony to argue that Fairway View mistakenly conflates the significance of the presence of fecal coliform with the possibility of raw sewage contamination. (Doc. 138 at p. 2). That is, Cedar Lodge argues that even if fecal coliform levels are normal, expert testimony demonstrates that raw sewage deposits might still remain in its pond bed. (*Id*.). Cedar Lodge also argues that Fairway View improperly isolates at the results of one test—the March 2015 test presented by Mr. Sharma—to determine that its pond is no longer contaminated, although Cedar Lodge has produced expert testimony indicating that coliform levels naturally dissipate over time and can fluctuate depending on water flow and rain levels. (*Id*. at pp. 2 – 4). Furthermore, Cedar Lodge maintains that reliance on one data point is misguided, because Fairway View has done nothing to fix the source of contamination, *i.e.*, its dysfunctional sewerage treatment system. (*Id*. at pp. 5 – 6). Because of this, Cedar Lodge asserts that the pond is susceptible to intermittent pollution that can cause varying levels of contamination, which in turn can naturally

dissipate over time. (*Id*.). Cedar Lodge also clarifies that it seeks to have its pond drained in order to conduct further testing to determine whether the pond is still contaminated. (*Id*. at p. 7). In Cedar Lodge's view, *Carr* supports its position that Fairway View should be required to drain the pond to discover whether sampling reveals contamination in need of remediation. (*Id*. at p. 7).

In its reply, Fairway View asserts that Cedar Lodge has not pointed to any evidence showing that there are, in fact, raw sewage deposits at the bottom of its pond. (Doc. 147). Fairway View also reasserts that the most recent testing of the pond's water and sediment indicates that there is no contamination. (*Id*. at p. 2). Fairway View argues that drainage and further testing was only ordered in *Carr* because the parties in that case did not dispute that frequent and high levels of fecal coliform were discharged. (*Id*. at p. 3). Here, Fairway View asserts that there is no proof that fecal coliform levels have been frequently high in Plaintiff's pond.

Without explicitly stating as much, the parties disagree on the standard applicable to Cedar Lodge's ability to recover for remediation or restoration of the pond. That is, it is unclear whether Fairway View disputes Cedar Lodge's ability to recover for *remediation* of the pond, i.e., the reduction of contaminant concentrations below some regulatory benchmark—here, the LDEQ's Risk Evaluation and Corrective Action Program ("RECAP") standards—, *restoration* of the pond to its former condition, or both. Fairway View impliedly maintains that Cedar Lodge is only entitled to recover for the cost of ridding the property of contamination, should any currently exist, which Cedar Lodge's expert has defined as levels of contaminants in

excess of risk levels as provided by an environmental regulatory agency—here, the Louisiana Department of Environmental Quality ("LDEQ"). (Doc. 198 at p. 61). Cedar Lodge has argued that under the standards set by the Louisiana Civil Code, it need only prove that the property is damaged, i.e., contains contaminants that have adversely impacted the condition of the property, to recover. (*See* Doc. 198 at pp. 17 – 18).[12]

In any event, the availability of either form of remedy turns on whether, based on available documentary and testamentary evidence, a fair-minded jury could reasonably conclude that the current physical condition of the property demonstrates damage. The easier form of damage to prove—and that which Fairway View argues is required in this case—is contamination. Fairway View highlights not only the admissions of Cedar Lodge and its corporate representative Mr. Witter that the pond is no longer contaminated, but also the most recent expert report explaining the various concentrations of contaminants in the pond, none of which exceed RECAP standards. Specifically, the record includes the results of water samples collected by Mr. Sidney Marlborough, a staff scientist for Toxicological & Environmental

---

[12] To be clear, the distinction between environmental remediation and restoration is thin and in most cases lacks an appreciable difference. In this case, however, the parties' positions on this point diverge such that the Court must note the distinction. Outside of the oilfield contamination context, and with the exception of contractual provisions requiring remediation of contamination, the term "environmental remediation" lacks a concrete definition. To articulate a clearer standard, and to provide clarity to the Court's order, the Court notes in the Louisiana oilfield context, "environmental damage" requiring "environmental remediation" as is that which poses "some risk to the health, safety, or welfare of the people of the state or [is] damaging to the public interest." *See Meaux v. Hillcorp Energy, Co.*, 09-591 (La. App. 3 Cir. 12/9/09); 26 So.3d 875, 879 (defining "environmental damage" under Louisiana Revised Statutes 30:29C(6)(b)). From that, the Court notes that environmental remediation in this context requires a finding of contaminants in concentrations that exceed applicable environmental regulatory standards—here, RECAP. This is different from restoration, which only requires that the plaintiff demonstrate damage that worsens the condition of the property. *See Coleman v. Victor*, 326 So.2d 344, 346 (La. 1976).

Associates, Inc., in December of 2012, which indicated fecal coliform levels of 2,400 col/100mL and 2,100 col/100mL, respectively, but no other forms of contamination. (*See* Doc. 138-9 at p. 37). It also contains the report of Mr. Suresh Sharma, which indicated that the level of fecal coliform found in the pond water was less than (<) 5 col/100mL, and that the detected concentrations of heavy metal constituents in the sludge and water samples he collected were below the LDEQ's RECAP Soil Screening Standards. (*See* Doc. 138-9). Cedar Lodge further points to the declaration of Mr. Sharma and the deposition of Alexander Sheffield, Fairway View's environmental expert, stating that fecal coliform levels fluctuate depending on the raw sewage discharge. (Docs. 138-3, 138-6).

Upon review of the evidence, the Court finds that Cedar Lodge has failed to satisfy its burden of demonstrating the existence of a genuine issue of material fact, namely, that the pond is currently contaminated and requires environmental remediation. That is, the evidence produced by Cedar Lodge to refute Fairway View's contention—including the declarations of Mr. Sharma and Mr. Sheffield stating that fecal coliform levels fluctuate depending on the raw sewage discharge—cannot lead a reasonable jury to conclude that the pond is currently contaminated and requires environmental remediation. The evidence Cedar Lodge offers in support of its contentions merely explain why the fecal coliform values are so low, and from there Cedar Lodge speculates that a current fecal coliform reading of the pond *might* reveal higher levels indicating contamination sufficient to warrant remediation. Although the Court may not evaluate evidence on a motion for summary judgment, the Court

may make a determination as to the "caliber or quantity" of evidence as part of its determination of whether sufficient evidence exists for the fact-finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). Here, the evidence only demonstrates that there are varying levels of contaminants—both heavy metals and fecal coliform—but none that exceed regulatory standards requiring environmental remediation. To the extent Cedar Lodge seeks "remediation" in the form of the reduction of contaminant concentrations below RECAP standards, the Court finds that such is not warranted for the reasons explained above. That the pond previously contained high levels of fecal coliform that subsequently bio-remediated, without more, does not create a genuine issue of material fact regarding whether the pond is currently contaminated or otherwise damaged. For this reason, Fairway View's motion for summary judgment on the issue of environmental remediation is **GRANTED**.

However, this finding is not dispositive of the question of whether Cedar Lodge is entitled to restoration of its property. Under general negligence principles, Louisiana law provides that "[o]ne injured through the fault of another is entitled to full indemnification for damages caused thereby." *Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co.*, 618 So.2d 874, 876 (La. 1993); *Coleman v. Victor*, 326 So.2d 344, 346 (La. 1976). "When property is damaged through the legal fault of another, the primary objective is to restore the property as nearly as possible to the state it was in immediately preceding the damage...." *Coleman*, 326 So.2d at 346. "Accordingly, the measure of damages is the cost of

restoring the property to its former condition. In assessing damage to property, generally, courts have considered the cost of restoration as the proper measure of damage where the thing damaged can be adequately repaired." *Id.*, 326 So.2d at 346–347. The availability of damages under either Louisiana Civil Code articles 667 or 2315, however, contemplates that Cedar Lodge must provide proof of actual property damage. *See* La. C.C. art. 667; La. C.C. art. 2315; *Jordan v. Travelers Ins. Co.*, 245 So.2d 151 (1971). Review of the record reveals testamentary evidence—not cited by Cedar Lodge—of Mr. Witter indicating that prior to initially walking the property in December 2012, the pond had been healthy, with clear water, abundant large fish, and not foul-smelling. (Doc.  138-10 at ¶ 6). His observations of the property in December 2012, however, indicated that the pond had cloudy water, smelled foul and appeared "dead." (Doc. 138-11 at ¶¶ 5 – 7). Although Cedar Lodge might have difficulty convincing a jury (1) of the alleged former condition of the property merely with the self-serving testimony of its corporate representative and (2) that any warranted restoration is required because of Fairway View's negligence, such is not the Court's concern at the summary judgment stage. Rather, the Court is charged with determining whether a fair-minded jury *might* return a verdict in favor of Cedar Lodge given the evidence presented. Although the possibility is remote, the Court finds that Cedar Lodge has offered sufficient competent evidence to overcome summary judgment. As such, to the extent Fairway View seeks summary judgment

on Cedar Lodge's ability to recover restoration damages,[13] that portion of the motion is **DENIED**.

> 2.    Lost Business Opportunity

Fairway View argues that Cedar Lodge has not provided evidence demonstrating that it has a compensable claim for the loss of any business opportunity. (*Id.* at pp. 9 – 17). Fairway View asserts that Cedar Lodge's corporate representative provided no testimony suggesting that the alleged contamination of the pond was the cause of his unilateral cessation of negotiations with Cedar Lodge's potential business partner Harvest Partners, Ltd. ("Harvest Partners") (*Id.* at pp. 9 – 14). Fairway View contends that despite knowledge of the alleged contamination, Harvest Partners still intended to move forward with the development on Cedar Lodge's property, and that Plaintiff unilaterally halted negotiations several months after Harvest Partners was notified about the alleged contamination. (*Id.* at pp. 12 – 14). To support this contention, Fairway View identifies emails between Blaine Lee, Harvest Partners' corporate representative, and Mr. Witter, in which Mr. Lee indicated a willingness on behalf of Harvest Partners to proceed with the development deal despite news of the alleged contamination. (Doc. 121-1 at p. 11). Fairway View also cites another email in which Mr. Lee indicated Harvest Partners' desire to maintain momentum on the development deal during "down time" due to the contamination, to which Mr. Witter never responded or indicated a willingness to remediate the alleged contamination and to proceed toward actual development.

---

[13] *See* discussion in note 12, *supra*, for the distinction between environmental remediation and restoration.

(Doc. 121-1 at p. 12). Further, Fairway View points to Mr. Witter's deposition testimony, during which time he testified that he could not remember when or how negotiations between Cedar Lodge and Harvest Partners broke down, thus implying that it had nothing to do with the alleged contamination. (Doc. 121-1 at pp. 12 – 13). Fairway View also disputes Plaintiff's argument that it can recover damages for a lost business opportunity even if it unilaterally halted the proposed deal with Harvest Partners. Fairway View argues that Cedar Lodge's unilateral abandonment of the project constitutes a "superseding cause" of any alleged damage and therefore relieves Fairway View of liability. (Doc. 147 at p. 4). Likewise, Fairway View asserts that Cedar Lodge's failure to take any steps to remediate the pond and continue negotiations with Harvest Partners demonstrates a failure to mitigate any damages. (*Id.*)

Assuming Cedar Lodge's ability to prove proximate causation, Fairway View asserts that: (1) documents prepared in anticipation of the development deal between Plaintiff and Harvest were never finalized or executed; (2) there was no agreement as to the value of the property Plaintiff was going to contribute; (3) no loan or financing vehicle was obtained or applied for; and (4) no final agreement was ever executed. (*Id.* at pp. 10 – 11). In the absence of such formalities or agreements, Fairway View argues that damages for the loss of this business opportunity are too speculative. (*Id.* at p. 14 – 17). To support this proposition, Fairway View cites *Chase v. Hilton Hotels Corp.*, 682 F. Supp. 316, 318 (E.D. La. 1988), wherein the court found that lost profits were not recoverable because a joint venture was not formed and the

plaintiff could not prove the venture's success with reasonable certainty. (Doc. 121-1 at p. 14).

Cedar Lodge counters that Fairway View's characterization of the facts does not warrant summary judgment because whether Harvest Partners or Cedar Lodge ceased negotiations is not a "material" fact for purposes of identifying the legal cause of the breakdown in negotiations. (Doc. 138 at p. 7). That is, Cedar Lodge maintains that even if it did halt discussions with Harvest Partners, this does not mean that the contamination was not the impetus behind Mr. Witter's actions. (Doc. 138 at p. 8). Instead, Cedar Lodge suggests that the December 2012 findings of fecal coliform values in excess of public safety standards, Mr. Witter's observations of the condition of the pond and Fairway View's alleged refusal to acknowledge the potential contamination problem prompted Cedar Lodge to proceed with precaution, thus making Cedar Lodge's fear of contamination a "substantial factor" in the decision to halt negotiations. (Doc. 138 at p. 11). To this end, Cedar Lodge contends that Fairway View presents no other potential cause for the deal's failure. (Doc. 138 at p. 12).[14]

Further, Cedar Lodge maintains that it has presented evidence such that a fair-minded jury could conclude that there is a "reasonable certainty" of lost business due to contamination as is required by Louisiana law. (Doc. 138 at p. 13). Cedar Lodge urges that although no joint venture was formed, the record contains "roughly

---

[14] The Court notes that Cedar Lodge's contention that Fairway View carries the burden of proving that contamination caused the lost business opportunity is improper. Because Cedar Lodge will bear the burden of proving causation—an essential element of its claim—at trial, it bears that identical burden at the summary judgment stage. *See, e.g., Knight v. Kellogg Brown & Root Inc.*, 333 Fed.App'x. 1, 2009 WL 1471788, at *6 (5th Cir. 2009) (noting that in a state negligence action, the plaintiff bears the burden of proving each disputed element of its claim).

equivalent documents evidencing the progress that had been made to shore up the main details" enough to satisfy its legal obligation of proving damages with "reasonable certainty." (Doc. 138 at p. 13). Additionally, Cedar Lodge urges that the likelihood of success of the business development and the commercial acumen of Mr. Witter makes it such that any estimate of damages is not speculative but instead satisfies Louisiana's "reasonable certainty" standard. (Doc. 138 at p. 13).

Whether Cedar Lodge is entitled to recover for any alleged lost business opportunity depends on whether it can offer sufficient proof to overcome its summary judgment burden on two issues—causation of damages and proof of losses.[15]

a.   *Causation*

As previously stated, in determining whether to impose liability under Louisiana Civil Code Article 2315, Louisiana courts employ a duty-risk analysis, whereby a plaintiff must establish that the defendant had a duty to conform his conduct to a specific standard; that the defendant's conduct failed to conform to the appropriate standard; that the defendant's substandard conduct was a cause in fact of the plaintiff's injuries; that the defendant's substandard conduct was a proximate cause of the plaintiff's injuries; and that the actual damages (the damages element)." *Adler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008). Louisiana courts generally define "proximate cause" as any cause which in natural and continuous

---

[15] Further, and consistent with Louisiana law, the potential amount of Cedar Lodge's recovery depends on its ability to prove that Mr. Witter acted with care and diligence to minimize the damages incurred because of any alleged contamination. *See Campbell v. Robinson*, 08-1429 (La. App. 4 Cir. 4/8/09); 10 So.3d 346, 349 ("A tort victim has an affirmative duty to make every reasonable effort to mitigate his or her damages…").

sequence, unbroken by any efficient, intervening cause, produces the result complained of and without which the result would not have occurred. *See e.g., Sutton v. Duplessi*s, 584 So.2d 362, 365 (La. App. 4 Cir. 1991). Typically, an intervening cause raises a question of concurrent cause, but if it is determined that the intervening cause is a superceding cause, the defendant is exonerated. *LeBlanc v. Jani-King, Inc.*, 538 So.2d 1156, 1158 (La. App. 4 Cir.1989), writ denied, 542 So.2d 1390 (La. 1989). When there are multiple causes of loss, the proper inquiry is whether the complained-of conduct was a substantial factor in bringing about the loss. *Perkins v. Entergy Corp.*, 782 So.2d 606, 611 (La. 2001); *see also Westchester Fire Ins. Co. v. Haspel–Kansas Inv. P'ship*, 342 F.3d 416, 420 (5th Cir. 2003). In determining whether an event was a "substantial factor," the questions are "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm" and whether each of the multiple causes "played so important a part in producing the result that responsibility should be imposed upon" each item of conduct. *LeJeune v. Allstate Ins. Co.*, 365 So.2d 471, 477 (La. 1978).

The question raised by Fairway View's motion is whether Mr. Witter's failure to negotiate the business development to fruition, or to continuously and actively pursue the transaction, constitutes an "intervening cause" that ultimately cuts off Fairway View's liability for the lost business opportunity, or whether it was one of many concurrent causes of the business development's breakdown such that Fairway View may still be found liable for all or part of the claimed losses. The Court finds that there remains a genuine issue of fact on this issue. Specifically, the Court

notes that Cedar Lodge has presented sufficient evidence such that a fair-minded jury could conclude that the alleged contamination played a role—even if just a marginal role—in the breakdown in negotiations between Cedar Lodge and Harvest Partners. Cedar Lodge has not presented direct evidence to that effect, but that is not required at the summary judgment stage or at trial, as this element can be proved by circumstantial evidence As such, summary judgment on this point is **DENIED.**

          *b.  Proof of Losses*

Under Louisiana law, damages are not recoverable where they are based on conjecture or speculation. Damages must be proved with reasonable certainty. If direct evidence is not available, the plaintiff may resort to evidence of customary or foreseeable profit. *Ellwest Stereo Theatres, Inc. v. Davilla*, 436 So.2d 1285, 1288 (La. App. 4th Cir. 1983); *Al Smith's Plumbing & Heating Service, Inc. v. River Crest, Inc.*, 365 So.2d 1122, 1126 (La. App. 4th Cir.1978).

This Court has previously denied a summary judgment motion on this precise issue. (*See* Docs. 69, 71). Specifically, the Court has found that Cedar Lodge put forth sufficient competent evidence—which included a master plan, budgets, project schedules, a draft letter of intent between partners, and a market feasibility study—to demonstrate a genuine issue of disputed material fact regarding Cedar Lodge's ability to prove losses from the business deal breakdown. (Doc. 71 at pp. 5 – 7). Since that time, Cedar Lodge has produced the expert report of Wilson LaGraize, a certified public accountant, who reviewed Cedar Lodge's documents and issued a report describing the achieved progress of the deal. (Doc. 138-15), thus buttressing the

Court's previous Ruling and Order finding the evidence produced by Cedar Lodge sufficient to meet its burden on summary judgment. Thus, summary judgment on this point is **DENIED**.

Accordingly,

**IT IS ORDERED** that the **Motion for Summary Judgment (Doc. 120)** filed by Sewer Treatment Specialists, LLC is **GRANTED**.

**IT IS FURTHER ORDERED** that the **Motion in Limine to Exclude Testimony of Plaintiff's Expert, Suresh Sharma (Doc. 143)** filed by Sewer Treatment Specialists, LLS is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the **Motion in Limine to Exclude Testimony of Plaintiff's Expert, Ron Ferris (Doc. 144)** filed by Sewer Treatment Specialists, LLC is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the **Motion for Partial Summary Judgment (Doc. 123)** filed by Plaintiffs Cedar Lodge is **DENIED**.

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment or, Alternatively, Motion for Partial Summary Judgment (Doc. 121)** filed by Defendant Fairway View is **GRANTED IN PART and DENIED IN PART**.

**IT IS FURTHER ORDERED** that **Fairway View's Motion to Strike the Declarations of Phillips Witter and Suresh Sharma (Doc. 142)** is **GRANTED IN PART and DENIED IN PART**.

Baton Rouge, Louisiana, this  21st  day of December, 2016.

_____

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

34