UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

CEDAR LODGE PLANTATION, LLC               CIVIL ACTION
ET AL.

VERSUS

CSHV FAIRWAY VIEW I, LLC ET AL.           NO.:13-00129-BAJ-EWD

RULING AND ORDER

Before the Court is the **Motion in Limine to Exclude the Testimony of Suresh Sharma and Ron Ferris (Doc. 145)** filed by CSHV Fairway View I, LLC, CSHV Fairway View II, LLC, and Campus Advantage, Inc. (collectively "Fairway View"). Cedar Lodge Plantation, LLC ("Cedar Lodge") filed a memorandum in opposition, (Doc. 156), and Fairway View replied (Doc. 161). The Court held evidentiary hearings on the motions on November 4, 2016 and November 9, 2016.

I.   BACKGROUND

Cedar Lodge filed the instant action on January 13, 2013, alleging that an apartment complex owned by Fairway View was responsible for "the continuous unpermitted discharge of harmful or hazardous substances, pollutants and/or contaminants, including but not limited to raw sewage onto Plaintiffs' property." (*See* Doc. 1; Doc. 50 at ¶ 9). Specifically, Cedar Lodge alleges that waterways, groundwater, and soil on its property have been contaminated, which has caused the property to be unsuitable for use, development, and/or sale. (*Id.* at ¶ 20).

In support of its claim, Cedar Lodge seeks to offer the testimony of Mr. Suresh Sharma—a consultant with M.S. Environmental Consultants who has been proffered as an expert in environmental compliance, permitting, and regulatory

requirements—to: i) determine if the indicated concentrations of analyzed constituents, i.e., specified heavy metals, exceed Risk Evaluation and Corrective Action Program (RECAP) standards established by the Louisiana Department of Environmental Quality (LDEQ), and ii) identify potential sources for contaminants in the pond on the Cedar Lodge property and whether regulatory violations have occurred as a result of any alleged unauthorized discharge. (Doc. 145-3 at p. 6). Cedar Lodge also retained the services of Mr. Ronald Ferris, a civil engineer whose expertise concerns "the design, construction and maintenance of sanitary sewerage facilities and whether applicable local, state and federal laws, regulations, policies, requirements, procedures and obligations have been followed." (Doc. 145-4 at p. 3). Through Mr. Ferris's testimony, Plaintiff hopes to establish the inadequacy of Fairway View's sewage system and, presumably, to establish the Fairway View property as the source of the alleged contamination of its pond. (Doc. 145-3).

Through the instant motion, Fairway View seeks to exclude the testimony of Mr. Sharma and Mr. Ferris as unreliable under Federal Rule of Evidence ("Rule") 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Doc. 145-1).

## II. DISCUSSION

### A. *DAUBERT* LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 states: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or

2

education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702; *see Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

Rule 702 is in effect a codification of the United States Supreme Court's opinion in *Daubert*, wherein the Supreme Court held that trial courts should serve as gatekeepers for expert testimony and should not admit such testimony without first determining that it is both "reliable" and "relevant." *Id.* at 589. *Daubert* was concerned with limiting speculative, unreliable, and irrelevant opinions from reaching a jury. *Id.* at n. 7. To satisfy their "gatekeeper" duty, trial courts look at the qualifications of experts and the methodology used in reaching their opinions and will not attempt to determine the accuracy of the conclusion reached by the expert. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

The validity or correctness of the conclusions an expert reaches is for the fact finder to determine after the *Daubert* analysis. *Id.* at 250. Further, as explained in *Scordill v. Louisville Ladder Group, L.L.C.*, No. 02–2565, 2003 WL 22427981, at *3 (E.D.La. Oct. 24, 2003) (Vance, J.):

> The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. See *Daubert*, 509 U.S. at 596 [113 S.Ct. 2786]. As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (citing *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)). The Fifth Circuit has added that, in determining the admissibility of expert

3

>testimony, a district court must defer to " 'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.' " *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir.1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir.1987)).

"Notwithstanding *Daubert*, the Court remains cognizant that 'the rejection of expert testimony is the exception and not the rule.' " *Johnson v. Samsung Electronics America, Inc.*, 277 F.R.D. 161, 165 (E.D.La. 2011) (citing Fed.R.Evid. 702 Advisory Committee Notes to 2000 Amendments).

Rule 703 of the Federal Rules of Evidence provides that the facts or data supporting an expert's opinion "need not be admissible in evidence in order for the opinion or inference to be admitted" if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Trial courts "should defer to the expert's opinion of what data they find reasonably reliable." *Peteet v. Dow Chemical Co.*, 868 F.2d 1428, 1432 (5th Cir. 1989), cert. denied, 493 U.S. 935 (1989). The number of sources on which an expert may reasonably rely "is virtually infinite," and such sources include interviews, reports prepared by third parties, scientific theories or test results, clinical and other studies, technical publications, business, financial, and accounting records, economic statistics, opinions of other experts, and general knowledge or experience. Jack B. Weinstein and Margaret A. Berger, 4 Weinstein's Federal Evidence § 703.04[3], at 703-15 to 703-20 (2d ed. 2005).

4

B.  **SURESH SHARMA**

As was previously noted, Mr. Sharma was retained as an environmental expert to testify that the pond on Cedar Lodge's property is contaminated because of Fairway View's negligence and that it requires remediation. (Doc. 145-1 at p. 6). To determine the extent of the alleged contamination, Mr. Sharma first reviewed sampling and analytical reports and affidavits of fact witnesses to determine whether contaminants were present. (Doc. 145-3 at pp. 9 – 10). Specifically, Mr. Sharma reviewed: i) the analytical report of Environmental Management & Training prepared in August of 2009; ii) two analytical reports of Toxicological and Environmental Associates prepared in December 2012 and May 2013; and the affidavits of Phillips Witter, Jeffrey Spurlock, Terry Grier and Sidney Marlborough. (Doc. 145-3 at pp. 9 – 10). Thereafter, Mr. Sharma performed a trend analysis with those results, which he used to determine appropriate sites from which to gather his own samples. (Doc. 145-3 at pp. 10 – 14). Mr. Sharma then collected seven sludge samples and one water sample and tested them (1) to determine total heavy metal and fecal coliform concentrations in the sludge and water samples, respectively, and (2) to test whether those concentrations exceeded LDEQ's RECAP Soil Screening Standards. (Doc. 145-3 at p. 18).

From his analysis, Mr. Sharma concluded that "the detected concentrations of analyzed constituents were below the RECAP Soil Screening Standards." (Doc. 145-3 at p. 71). That is, Mr. Sharma found that the concentrations of all heavy metals in the sludge samples he collected fell below the RECAP threshold for finding the existence of a risk to human health. Mr. Sharma also deduced from his trend analysis

5

the source of the alleged contamination and concluded that discharge from the Fairway View apartments was the cause of potential contamination on the Cedar Lodge property. (Doc. 145-3 at p. 21).

Thereafter, at his deposition, Mr. Sharma confirmed his ultimate conclusion that heavy metal concentrations fell below RECAP standards but qualified this conclusion with the statement that some samples exceeded Toxicity Characteristic Leaching Procedure ("TCLP") standards for acceptable lead and chromium concentrations.[1] (Doc. 145-5 at p. 165). It is on this basis that Fairway View seeks to exclude Mr. Sharma's entire report and testimony. Namely, Fairway View objects to Mr. Sharma's testimony, arguing that it will not assist the trier of fact in determining whether remediation of Cedar Lodge's pond is necessary because his opinion lacks proper methodology and is therefore unreliable. (Doc. 145-1 at p. 6). Fairway View asserts that Mr. Sharma's use of RECAP standards to test the pond sludge in his March 2015 expert report was "discredited" by his subsequent deposition testimony, in which Mr. Sharma represented that he tested for and applied the wrong standards (RECAP) and that he should have performed further testing and applied different standards, namely, the TCLP.[2] (Doc. 145-1 at pp. 7 – 8). Because of Mr. Sharma's alleged acknowledgement and subsequent failure to test sludge samples using the

---

[1] The TCLP standard is an extraction procedure under which a scientist simulates a landfill environment with rainfall and acidity controls, then tests for contaminants in the resulting leachate. Under the TCLP standard, even if a material contains contaminants, EPA does not consider it "hazardous" unless the lead is capable of "leaching" out of the material, a finding that can only be determined after ascertaining the leachability of the media.

[2] Fairway View does not challenge, and the Court does not address, Mr. Sharma's conclusions regarding the presence and concentration of fecal coliform in Cedar Lodge's pond. The challenge, and consequently this Ruling, only concerns Mr. Sharma's application of environmental regulatory standards to the concentration of heavy metals in Cedar Lodge's pond.

TCLP standards, Fairway View maintains that his testimony will not assist the trier of fact to determine whether remediation is necessary. (Doc. 145-1 at p. 12).

Cedar Lodge counters that Mr. Sharma never "admitted" that he should have conducted additional testing using TCLP procedures. (Doc. 156 at pp. 13, 14). Instead, Cedar Lodge argues that Mr. Sharma's deposition testimony "simply pointed out that the heavy metal values found—chromium and lead—happen to exceed Step One of the TCLP standards (total concentration test)." (Doc. 156 at p. 13). Further, Cedar Lodge urges that to the extent application of *any* standards—whether RECAP or TCLP—reveals the presence of a hazardous concentration of contaminants, Fairway View is liable for the resulting damages to the extent such damage can be attributed to Fairway View's negligence. (Doc. 156 at p. 12).

1. Contamination and Remediation Conclusion

After reviewing the parties' arguments and evidence, the Court finds that Mr. Sharma's methodology for testing sludge samples and subsequently comparing them with RECAP standards is not an inherently unreliable method for discerning whether heavy metal concentrations pose a risk to human health. The Court accepts Mr. Sharma's representation that the manner in which he reviewed previously prepared analytical reports, collected and tested sludge and water samples, and applied the results of his tests to RECAP standards was a methodology accepted in the scientific community. Further, and contrary to Fairway View's assertions, the Court notes that there is no evidence indicating that RECAP's standards may not be applied to heavy metal results derived from sludge samples.

The Court is not satisfied, however, that Mr. Sharma's testimony regarding application of TCLP standards to the facts of this case is reliable under Rule 702 and *Daubert*. Despite Cedar Lodge's insinuations to the contrary, Mr. Sharma did not employ any of the TCLP procedures in this case. Mr. Sharma limited his testing and report to determining compliance with RECAP standards, and did not purport to begin, let alone complete, the TCLP process. Although Mr. Sharma determined the total concentration of heavy metals and compared them to TCLP threshold numbers, thus completing what Cedar Lodge and Mr. Sharma represent is the first step in the TCLP process, he failed to run the leachability test, which is the second step in determining the toxicity of the pond sludge. (Doc. 199 at pp. 19 – 20). Because Mr. Sharma did not complete the TCLP *process* to determine what the ultimate results of the test might reveal, any testimony regarding TCLP's potential impact on Cedar Lodge's claims of contamination would amount to pure, unfounded speculation and would therefore be neither reliable nor helpful to a jury.

2. Directional Flow of Contaminants

The Court finds that Mr. Sharma's trend analysis and ultimate conclusion revealing the directional flow of the alleged contamination is reliable. Mr. Sharma mapped the directional flow of contaminants using previously prepared fecal coliform and heavy metal readings to determine that contaminants were likely entering the Cedar Lodge pond from the west, near the Fairway View apartments. (Doc. 145-3 at p. 20). From there, Mr. Sharma completed a trend analysis using the results of the samples he collected to determine that "the highest concentrations of detected heavy metals … is indicative of the drainage ditch located on the Fairway View Apartments

as being the probable source of release of heavy metal contamination and contributing to the release of pollutants on the adjoining property." (Doc. 145-3 at p. 20). Without determining whether Mr. Sharma reached the proper conclusion, the Court finds that this was an acceptable method of collecting samples and attempting to identify the source of the contaminants.

Although the trend analyses prepared by Mr. Sharma are reliable, the Court finds that allowing Mr. Sharma to testify about the trend analysis he prepared—that is, the trend analysis compiled from the sludge samples he collected—toes the line of being misleading and thus excludable under Federal Rule of Evidence ("Rule") 403. Under Rule 403, a trial court may exclude evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.". Fed. R. Evid. 403. Further, it is axiomatic that even if an expert witness's testimony is relevant and admissible under Rules 702, 703 and *Daubert*, a court may still exclude his testimony under Rule 403 upon a finding that the probative value of the testimony is substantially outweighed by unfair prejudice. *Guillory v. Domtar Industries Inc.*, 95 F.3d 1230 n. 11 (5th Cir. 1996).

Upon review of Mr. Sharma's report, the Court finds that Mr. Sharma's trend analysis and related testimony will mislead the jury into believing that the trend indicates an indefinite decrease in heavy metal concentrations the further east one gets from the Fairway View apartments. This is because Mr. Sharma's trend analysis using the sludge and water samples he collected only plots the heavy metal concentrations for the three sludge samples on the west end of the pond, the trend of

9

which illustrates a downward slope, indicating that heavy metal concentrations steadily decrease from the Fairway View side of the pond to the east side of the pond. (*See* Docs. 145-3 at pp. 104 – 105). However, the four remaining sludge samples collected from the east end of the pond show varying levels of heavy metal concentrations, some of which exceed those found in the last plotted point. Most notably, sludge sample #6, which is the second-most eastern sample that Mr. Sharma collected, contains the second highest concentration of most heavy metals in the pond, which is inconsistent with Mr. Sharma's presentation of the evidence. (*See* Doc. 145-3 at p. 72).

The same is true of the trend analysis that plots the analytical results of the May 2013 report Mr. Sharma reviewed before preparing his own report. Sidney Marlborough collected three sludge samples from Cedar Lodge's pond to test them for heavy metal concentrations. Two samples were taken from the west end of the pond (the Outfall and Lake SE samples) and a third was taken from the far east side of the pond (the Lake SC sample). (*See* Doc. 145-3 at p. 68). Mr. Sharma's trend analysis only plots the Outfall and Lake SE samples, which indicates a steady decrease in the heavy metal concentration from west to east. However, the Lake SC sample—which Mr. Sharma did not plot—shows higher heavy metal concentrations than the Lake SE sample. (Doc. 145-3 at p. 68).

These trend analyses, which Cedar Lodge intends to use to show the lateral distribution of heavy metal concentrations in the pond, illustrate an attempt by Mr. Sharma and Cedar Lodge to misleadingly present the findings of these reports. Because the Court finds the probative value of Mr. Sharma's presentation of his trend

10

analysis small compared with the danger that it will mislead the jury, the Court will exclude the trend analyses and related testimony.

### C. RONALD FERRIS

Fairway View also seeks to exclude the testimony of Ronald Ferris, a civil engineer, who Cedar Lodge intends to offer as an expert in: i) the design, construction and maintenance of sanitary sewerage facilities, and ii) whether applicable local, state and federal regulations policies, requirements, procedure and obligations have been followed. (Doc. 145-4 at p. 3). Fairway View asserts that Mr. Ferris based his opinions on inappropriate or inapplicable methodologies, thus making his testimony unreliable. (Doc. 145-1 at pp. 13 – 18). Additionally, Fairway View seeks to exclude any testimony in which Mr. Ferris opines about the moral and fiduciary responsibility of Fairway View. (Doc. 145-1 at pp. 13 – 18).

Fairway View draws the Court's attention to the following excerpts from Mr. Ferris's report:

> "Defendants have a fiduciary and moral responsibility to the general public, including to the Plaintiffs, to protect against the release of harmful or hazardous substances. Defendants did, in fact, breach that duty."

> "Defendants have a fiduciary and moral responsibility to operate and maintain the facility for the benefit and safety of the general public, including the Plaintiffs. Defendants did, in fact, breach that duty."

(Doc. 145-1 at p. 13). As to these two opinions, Fairway View asserts that Mr. Ferris failed to identify the legal source for any of the alleged fiduciary or moral duties possessed by Fairway View. (Doc. 145-1 at p. 16). Instead, Fairway View argues that during his deposition, Mr. Ferris cited his "own personal belief" as authority for his

11

assertion that Defendants had a fiduciary duty to the general public to prevent the release of a hazardous substance. (Doc. 145-1 at p. 15). With respect to his opinion that Fairway View had a moral responsibility to prevent the release of hazardous substances, Mr. Ferris stated in his deposition that his moral beliefs did not bind Fairway View. (Doc. 145-1 at p. 15). Because of these "concessions," Fairway View argues that Mr. Ferris has no basis for the above-mentioned opinions and should not be permitted to testify on them at trial. (Doc. 145-1 at p. 16).

Fairway View also challenges Mr. Ferris's opinion regarding the specifications of Fairway View's sewage treatment system. Fairway View argues that Mr. Ferris compared those specifications for compliance with Louisiana regulatory requirements and the 2004 edition of the Recommended Standards for Wastewater Facilities (also known as the "Ten States Standards") despite not knowing whether these standards were applicable at the time the sewerage system was constructed. (Doc. 145-1 at pp. 16 – 18). Fairway View highlights the following statements made by Mr. Ferris during his deposition:

> Q. As you sit here today, you can't say for certain whether or not Exhibit E, the 2004 edition and the very standards that are in it, were in effect in Louisiana when Fairway View II was constructed in 1981, correct?
> A. That is correct.
>
> \* \* \* \*
>
> Q. If you assume that since the Fairway View II's sewerage system was designed and constructed that the recommendations have changed in terms of the types of requirements that are in the

12

>       recommendations, would there be any requirement
>       on a property like Fairway View Apartments to go
>       back and essentially retrofit the sewer system to
>       meet the changed requirements?
> A.    No, there would not be.

(Doc. 145-1 at pp. 17 – 18). Fairway View treats these statements and their argument that Mr. Ferris relied on an inapplicable, later edition of regulatory standards as a basis for its assertion that Mr. Ferris's opinion regarding the construction of its sewerage system is unreliable.

In response, Cedar Lodge argues that Fairway View's challenge respecting Mr. Ferris' attempt to establish a standard of care in this case is not a basis upon which he can be excluded. This is because many of Cedar Lodge's claims do not require a standard of care at all and, to the extent they do, Mr. Ferris's experience is grounds enough to at least opine about Fairway View' moral and fiduciary duty. (Doc. 156 at p. 6). Furthermore, Cedar Lodge asserts that even if Mr. Ferris failed to adequately explain the standard of care in his deposition and expert report, this failure is relevant to his credibility as an expert and not whether he is qualified to testify. (Doc. 156 at p. 5). In any event, Cedar Lodge argues that the Court should allow testimony in which Mr. Ferris does not refer to Fairway View's moral and fiduciary duties. (Doc. 156 at pp. 6 – 7). Lastly, Cedar Lodge asserts that Mr. Ferris's references to the 2004 version of the Sanitary Code and the Ten States Standards are appropriate because they establish a proper standard of care and provide a good reference point for demonstrating the alleged flaws in Fairway View's sewerage system. (Doc. 156 at pp.8 – 11).

At the *Daubert* hearing, the Court entertained brief argument on the parties' contentions concerning Mr. Ferris' proposed testimony. At that time, the Court noted that should Mr. Ferris qualify as an expert at trial, his testimony will be limited to any observations he made as the result of any visual inspection he made of the property either by way of his physical presence on the property or through video inspections he either conducted or observed. (Doc. 199 at p. 141). That is, because Mr. Ferris' testimony regarding certain moral and ethical duties associated with constructing and maintaining the sewerage system at issue will not assist the jury, Mr. Ferris will not be permitted to testify with respect to these issues. *See, e.g., Kadlec Medical Center v. Lakeview Anesthesia Associates*, 2006 WL 1328809 (E.D. La. May 12, 2006) (Africk, J.). Additionally, because Cedar Lodge does not dispute that the 2004 version of the Sanitary Code and Ten States Standards were not in effect at the time the sewerage system at issue was constructed, and that Fairway View was not required to retrofit its sewerage system to comply with the 2004 Standards, Mr. Ferris will not be permitted to testify as to whether the sewerage system was in compliance with those standards. Such testimony would not be helpful and would unfairly mislead the jury by implying that because Fairway View's sewerage system was not in compliance with the updated regulatory standards, liability automatically attaches.

## IV. CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that the **Motion in Limine to Exclude the Testimony of Suresh Sharma and Ron Ferris (Doc. 145)** filed by Fairway View is **GRANTED IN PART** and **DENIED IN PART**.

Baton Rouge, Louisiana, this 23rd day of December, 2016.

_____
**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**