UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

CEDAR LODGE PLANTATION, LLC,                          CIVIL ACTION
ET AL.

VERSUS

CSHV FAIRWAY VIEW I, LLC, ET AL.                      NO.: 13-00129-BAJ-EWD

RULING AND ORDER

Before the Court are several motions, including a **Motion for Reconsideration**

**or, Alternatively, Motion to Amend (Doc. 223)** filed by Cedar Lodge Plantation,

LLC ("Cedar Lodge"); a **Motion for Certificate of Appealability (Doc. 224)** filed

by Cedar Lodge; a **Motion for Reconsideration Pursuant to Federal Rule of**

**Civil Procedure 54(b) (Doc. 225)** filed by CSHV Fairway View I, LLC, CSHV

Fairway View II, LLC and Campus Advantage, Inc. (collectively "Fairway View"); a

**Motion for Reconsideration on Order Granting STS's Motion for Summary**

**Judgment (Doc. 231)** filed by Cedar Lodge; a **Motion in Limine to Exclude**

**Evidence and Testimony Regarding the Alleged Cost to Drain the Pond**

**(Doc. 229)** filed by Fairway View; and a **Motion in Limine to Exclude Evidence**

**and Testimony Regarding Alleged Sewage Discharges After January 29,**

**2013 (Doc. 236)** filed by Fairway View. The parties have filed memoranda in

opposition, (Docs. 232, 234, 238, 239, 244, 246), and replies, (Docs. 249, 250, 253),

where applicable. The Court has jurisdiction pursuant to 28 U.S.C. § 1332. Oral

argument is not necessary.

## I.   BACKGROUND

Cedar Lodge initiated this action against Fairway View on January 29, 2013, in the Nineteenth Judicial District Court, Parish of East Baton Rouge, State of Louisiana, (*see* Doc. 1), alleging that Fairway View is "responsible for the continuous, unpermitted discharge of harmful or hazardous substances, pollutants and/or contaminants, including but not limited to raw sewage onto Plaintiffs' property," (Doc. 50 at ¶ 9). Cedar Lodge sought damages resulting from Fairway View's allegedly negligent actions and specifically sought "the cost of remediation and repair of Plaintiffs' property, diminution of the value of Plaintiffs' property, loss of use and enjoyment of Plaintiffs' property, lost business opportunity[,] and/or lost profits . . ." (Doc. 50 at ¶ 25).

The parties filed several evidentiary and dispositive Motions, upon which, after considering the positions raised during oral arguments on the assertions presented in those Motions, the Court entered rulings thereon. (*See* Docs. 219, 222).[1] Immediately thereafter, the parties filed several additional motions seeking further review of the merits of their claims and defenses, each of which are addressed separately below.

---

[1] Throughout this Ruling and Order, the Court will refer to the Ruling and Order contained at Record Document 219 as the "Dispositive Motion Ruling" and the Ruling and Order contained at Record Document 222 as the "*Daubert* Ruling."

## II. DISCUSSION

### A. Motions for Reconsideration

#### 1. *Cedar Lodge's Motion for Reconsideration*

In its Motion, Cedar Lodge asks the Court to, *inter alia*, reconsider the portion of the *Daubert* Ruling that limited the testimony of its purported environmental expert, Mr. Suresh Sharma.[2] (Doc. 223). Cedar Lodge's motion focuses on that portion of the *Daubert* Ruling in which the Court held that (1) Mr. Sharma may not testify regarding the potential impact that an assessment of contaminant concentrations under Toxicity Characteristic Leaching Procedure ("TCLP") standards might have on this litigation without having completed the entire TCLP process[3] and (2) Mr. Sharma may not testify about the trend analysis he conducted to assess the directional flow of the alleged contaminants. (*See* Doc. 222).

##### a. Legal Standard

The Federal Rules of Civil Procedure do not expressly recognize a motion for reconsideration. *Bass v. U.S. Dep't of Agric.*, 211 F.3d 959, 962 (5th Cir. 2000). However, the United States Court of Appeals for the Fifth Circuit has consistently

---

[2] In this same Motion, Cedar Lodge also asked the Court to modify its Ruling and Order (Doc. 222) to authorize an interlocutory appeal of the Court's ruling regarding various aspects of Mr. Sharma's testimony. The Court addresses that portion of the motion in Part C, *infra*.

[3] As is more fully explained in the *Daubert* Ruling addressing Fairway View's original motion *in limine*, Mr. Sharma stated for the first time in his deposition that certain concentrations of heavy metals in the pond exceeded TCLP standards and, on that basis, wanted to testify at trial regarding that finding. However, Mr. Sharma did not complete the entire TCLP process, namely, the leachability portion, which has been called "Step Two" of the TCLP process throughout this litigation. (*See* Doc. 222 at p. 8).

recognized that such a motion may challenge a judgment or order under Rules 54(b), 59(e), or 60(b) of the Federal Rules of Civil Procedure. *See, e.g., U.S. ex rel. Spicer v. Westbrook,* 751 F.3d 354, 367 (5th Cir. 2014) (reviewing an appeal of a motion for reconsideration under Rule 59(e)); *Iturralde v. Shaw Grp., Inc.,* 512 F. App'x 430, 432 (5th Cir. 2013) (reviewing an appeal of a motion for reconsideration under Rule 54(b)); *United States v. William,* 124 F.3d 192 (5th Cir. 1997) (reviewing an appeal of a motion for reconsideration under Rule 60(b)). Cedar Lodge has specifically requested that the Court grant reconsideration under Rules 59(e), 60(b)(1) and/or 60(b)(6). (*See* Doc. 223-1 at p. 2).

"A Rule 59(e) motion 'calls into question the correctness of a judgment.'" *Templet v. HydroChem Inc.,* 367 F.3d 473, 478 (5th Cir. 2004) (*In re Transtexas Gas Corp.,* 303 F.3d 571, 581 (5th Cir. 2002)). "A Rule 59(e) motion must clearly establish either a manifest error of law or fact or must present newly discovered evidence" and cannot be used to "raise arguments that could, and should, have been made before the judgment issued." *Advocare Int'l LP v. Horizon Labs., Inc.,* 524 F.3d 679, 691 (5th Cir. 2008).[4] "A 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Shaw v. Broadcast.com, Inc.,* No. 98-cv-2017-P, 2005 U.S.

---

[4] Cedar Lodge alludes to a test adopted by the United States District Court for the Eastern District of Louisiana, by which a movant may additionally prevail on a Rule 59(e) motion if she establishes a need to "prevent manifest injustice." *Prudhomme v. Todd,* No. CIV. A. 08-3916, 2009 WL 4891940, at *2 (E.D. La. Dec. 9, 2009). *See also Castrillo v. Am. Home Mortg. Servicing, Inc.,* No. 09-4369, 2010 WL 1424398, at *4 (E.D. La. Apr. 5, 2010). Cedar Lodge's assertion of the "need to...prevent manifest injustice" in this matter is properly categorized as an argument for correcting a "manifest error of law." Accordingly, the Court opts here to adhere to the slightly narrower prevailing standard articulated by the Fifth Circuit.

Dist. LEXIS 34553, at *5 (N.D. Tex. Dec. 20, 2005) (quoting *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000)); *cf. Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (defining "manifest error" in the appellate review context as "one that is plain and indisputable, and that amounts to a complete disregard of the controlling law").

Courts have significant discretion in deciding whether to grant a motion to reconsider under Rule 59(e). *Templet*, 367 F.3d at 479. Nevertheless, granting a motion for reconsideration is "an extraordinary remedy that should be used sparingly." *Id.* Thus, in determining whether to grant a motion to reconsider, courts must balance "the need to bring litigation to an end" and "the need to render just decisions on the basis of all the facts." *Id.*

"The purpose of Rule 60(b) is to balance the principle of finality of a judgment with the interest of the court in seeing that justice is done in light of all the facts." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 638 (5th Cir. 2005) (citing *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. Unit A Jan. 1981)). Similar to the standard under Rule 59(e), "the decision to grant or deny relief under Rule 60(b) lies within the sound discretion of the district court and will be reversed only for abuse of that discretion." *Id.* (quoting *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc)) (internal citations omitted). A district court may grant relief under Rule 60(b) for one of six reasons listed therein: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation, or misconduct by an opposing party; (4) a void judgment; (5) a satisfied, released, or

discharged judgment; or (6) any other reason that justifies relief. Fed. R. Civ. P. 60(b). The Fifth Circuit has instructed that relief under Rule 60(b)(6) "is mutually exclusive from relief available under sections (1)-(5)." *Hesling*, 396 F.3d at 642 (citing *Transit Cas. Co. v. Sec. Trust Co.*, 441 F.2d 788, 792 (5th Cir. 1971)). Furthermore, relief under Rule 60(b)(6) is only warranted when "extraordinary circumstances are present." *Id.* (quoting *Am. Totalisator Co., Inc. v. Fair Grounds Corp.*, 3 F.3d 810, 815 (5th Cir. 1993)) (internal citation omitted).

b.     Reconsideration of TCLP Testimony

i.     *Arguments of the Parties*

Cedar Lodge insists that Mr. Sharma should be allowed to testify regarding his findings under Step One of the TCLP procedure, which determines the total concentration of heavy metals and compares them to TCLP's threshold numbers for screening. (Doc. 223-1 at p. 4). In the *Daubert* Ruling, the Court held that Mr. Sharma may not testify about the applicability of TCLP standards to Cedar Lodge's claims of contamination because such testimony would amount to "unfounded speculation" and would not be helpful to the jury because Mr. Sharma failed to complete the TCLP process. (Doc. 222 at p. 8). Cedar Lodge urges that Step One of the TCLP process is severable from Step Two, which tests for the leachability of the medium – here, the pond sludge – in determining whether the pond is contaminated. (*Id.* at pp. 4-5).[5]

---

[5] Cedar Lodge also relies on *Carr v. Oake Tree Apartments*, 34,539 (La. App. 2 Cir. 5/9/01); 786 So. 2d 230, for its assertion that Fairway View is legally obligated to pay for Step Two of the TCLP process, which it argues would require draining the pond to determine the leachability of the underwater sediment. *See* Doc. 223-1 at p. 4. Fairway View counters that Cedar Lodge's reliance on *Carr* does not provide support for its assertion that the pond must be drained at Fairway View's expense. *See* Doc. 234 at p. 4. The Court finds Cedar Lodge's reliance on *Carr* to be unavailing. In *Carr*, the Louisiana Second Circuit Court of Appeal ordered that the pond on a landowner's property be drained to conduct

Because Cedar Lodge believes that the "Step One conclusion can be severed from Step Two such that failure to conduct Step Two should...not bear on whether a Step One conclusion is reliable and helpful to a jury," Cedar Lodge maintains that Mr. Sharma should be allowed to testify about TCLP findings. (Doc. 223-1 at pp. 5-6).

Fairway View counters that the Court should deny Cedar Lodge's Motion to reconsider its *Daubert* Ruling regarding Mr. Sharma's ability to testify on TCLP standards. Fairway View asserts that because Mr. Sharma testified that Step Two of the TCLP process is necessary to his analysis of the pond's current state and whether it is contaminated, and because he has not completed Step Two, he has no opinions regarding the entire TCLP analysis. (Doc. 234 at p. 3).

### ii. *Analysis*

The Court finds that Cedar Lodge has not offered any persuasive reason for which the Court should allow Mr. Sharma to testify about the TCLP's impact on its claims of contamination. That is, Cedar Lodge has not demonstrated that the Court's *Daubert* Ruling was manifestly erroneous, therefore warranting modification, or that

---

environmental tests to determine whether the pond was contaminated *after* evidence adduced at trial demonstrated that the pond was subject to the frequent presence of high levels of fecal coliform discharged into it with effluent from a sewage treatment plant of a neighboring apartment complex. 34,539 at p. 5; 786 So.2d at 234. The trial court issued a partial judgment ordering (1) an injunction on the discharge of effluent onto the plaintiff's property and (2) that the pond be drained so that the additional tests could be conducted, both of which the Second Circuit affirmed. *Id.* at p. 1; 786 So.2d at 232. The Court reads *Carr* as a guide on how to determine damages owed to Cedar Lodge if the jury determines that it is entitled to restoration of its pond. In no way does *Carr* stand for the proposition that this Court is required to order that the pond be drained at Fairway View's cost to determine the extent of contamination. The Court notes that Mr. Sharma notified Mr. Phillips Witter ("Mr. Witter"), the owner of the Cedar Lodge property, that the pond would need to be drained to determine whether it was contaminated and the scope of the alleged contamination, a suggestion to which Mr. Witter offered no response. *See* Doc. 199. Considering this, it is difficult to interpret Cedar Lodge's heavy reliance on *Carr* as anything other than a way to avoid paying potentially millions of dollars in testing only to discover whether the pond is actually contaminated.

relief is otherwise justified. As has been stated throughout this litigation, the purpose of the overall TCLP process is to determine how hazardous a specific contaminants' presence in a medium affects a body of water. Cedar Lodge does not dispute that Mr. Sharma did not complete the entire TCLP process. (*See* Doc. 223-1 at p. 4). If Cedar Lodge wished to solicit testimony from Mr. Sharma that under TCLP standards, the pond is contaminated, such testimony would only be reliable if Mr. Sharma had completed the entire TCLP process and obtained final results under the procedure to support his conclusion. Mr. Sharma's proposed testimony must be supported by "appropriate validation – *i.e.*, 'good grounds,' based on what is known." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-593 (1993). Whether Cedar Lodge's pond contains contaminants that have an adverse environmental impact under TCLP standards requires a completion of the TCLP process. Because that process is incomplete, the answer to that question is unknown, and any testimony regarding the completed step of the TCLP process would invite the jury to speculate about the results of Step Two and, consequently, the overall process. The testimony that Cedar Lodge wishes to solicit from Mr. Sharma would be misleading under Federal Rules of Evidence 403 and 702 given the incomplete nature of the TCLP process. Therefore, the Court finds that it would be improper for Mr. Sharma to present *any* testimony indicating an affirmative answer to the question of whether the pond is contaminated, which would be based solely on Step One of the process. Accordingly, the Court declines to reconsider that portion of the *Daubert* Ruling addressing Mr. Sharma's ability to testify regarding TCLP standards.

Finding that Cedar Lodge has not presented a legally sufficient argument in support of its Motion for reconsideration regarding Mr. Sharma's proposed TCLP testimony, that portion of the Motion is **DENIED**.

        c.    Reconsideration of Trend Analysis Charts and Related Testimony

        i.    *Arguments of the Parties*

Cedar Lodge also asks the Court to reconsider the portion of its *Daubert* Ruling prohibiting Mr. Sharma from testifying about the source of alleged contamination based on several trend analyses he reviewed and/or prepared. (Doc. 223-1 at pp. 5-7). Cedar Lodge argues that this testimony should be allowed because (1) the charts are accurate, even if they do not contain every single data point; (2) the charts are not part of the methodology or conclusions reached in Mr. Sharma's report and therefore do not undermine Mr. Sharma's conclusions regarding the ultimate source of the contamination; and (3) the last trend analysis chart, which plots fecal coliform values as ascertained in a December 2012 sampling of the subject pond, contains all of the data points and is not misleading. (Doc. 223-1 at pp. 5-6).

Fairway View disagrees, emphasizing that Mr. Sharma's charts are inaccurate because he "consistently ignored data that did not support the opinions Cedar Lodge wanted him to give in this case, excluded that data without any scientific or statistic reason for doing so, and had no explanation for why he excluded only data that did not support his conclusions." (Doc. 234 at p. 5). Fairway View also argues that the Court should disregard Cedar Lodge's assertions regarding the validity of Mr. Sharma's conclusions and the accuracy of the fecal coliform trend analysis chart,

9

maintaining that the charts are visual representations of Mr. Sharma's conclusions and that the final trend analysis also fails to plot the biochemical oxygen demand ("BOD") and total suspended solids ("TSS") data points "because both samples contain data points that were significantly higher farther away from Fairway View." (*Id.* at p. 6).

ii.    *Legal Analysis*

Despite Cedar Lodge's arguments in support of the trend analysis's *reliability*, the Court emphasizes that an inadequate indicia of reliability was not the basis upon which Mr. Sharma's trend analysis testimony and charts were excluded. In its *Daubert* Ruling, the Court held that although the methods that Mr. Sharma used to gather his information were reliable, the trend analysis charts and related testimony are *misleading* under Rule 403. (*See* Doc. 222). Cedar Lodge has not offered any why reason the Court should recant that finding, and therefore Cedar Lodge's Motion to reconsider the admissibility of Mr. Sharma's trend analysis and related testimony is **DENIED**.

d.    Mr. Sharma's Qualifications

At the hearing on Fairway View's Motion in Limine (Doc. 145), the Court deferred ruling on Mr. Sharma's qualifications pending a thorough review of his *curriculum vitae* and other related documents. As has been previously noted, Mr. Sharma was offered by Cedar Lodge as a professional in geoscience/geology, specifically as those fields relate to the analysis and evaluation of environmental contaminants, contamination, and migration trends of contaminants. Fairway View

was allowed to traverse Mr. Sharma's qualifications at the evidentiary hearing, but the Court reserved ruling on Mr. Sharma's qualifications while hearing additional testimony regarding his methodologies and conclusions as they relate to this case.

Mr. Sharma obtained his Bachelor's and Master's degrees in Geology from Panjab University, Chandigarh, India, in 1973 and 1974, respectively. (Doc. 143-3 at pp. 6, 157). He thereafter was employed by the Government of India as a Geologist/Hydrogeologist from 1975 until 1986, at which time he immigrated to the United States. (*Id.* at p. 6). Since October 1986, Mr. Sharma has been involved with a variety of environmental compliance issues through various consulting agencies. In 1993, Mr. Sharma began his employment with M.S. Environmental Consultants, for which he regularly handles regulatory compliance permitting, permitting of wastewater discharge, and permitting of solid waste, among other things. (*See id.* at pp. 151-61). Mr. Sharma is also a Certified Professional Geoscientist/Geologist in Louisiana, Missouri, and Arkansas and is a Certified Professional Geologist with the American Institute of Professional Geologists. Mr. Sharma has testified as an expert in one other case. His testimony in that case, which was litigated in the 24th Judicial District Court in Jefferson Parish, Louisiana, involved soil contamination by organic constituents. (*See id.* at p. 8). Mr. Sharma has not published any books or written any articles concerning environmental contamination and remediation procedures, and he has not otherwise been involved in a case concerning the contamination of third-party property. Although Mr. Sharma has on occasion performed site assessments of various properties to coordinate corrective action plans and remediation procedures,

the bulk of his work has concerned preparing permit applications for industrial and commercial facilities and addressing permitting and compliance issues with said facilities.

Mr. Sharma's expert report contains opinions regarding the total concentration of suspected contaminants of concern, compared with the Louisiana Department of Environmental Quality's RECAP Soil Screening Standards, as well as a trend evaluation to determine lateral distribution of suspected contaminants in an attempt to identify the potential source of the alleged contamination. (*See id.*).

As is well established and as has been stated previously in the Court's *Daubert* Ruling, district courts must function as gatekeepers, permitting only reliable and relevant expert testimony to be presented to the trier of fact. Before allowing expert testimony to be heard, however, the district court must be assured that the proffered witness is qualified to testify by virtue of his "knowledge, skill, experience, training or education." Fed. R. Evid. 702. A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods*, 163 F.3d 935 (5th Cir. 1999). The issue is whether a particular expert has "sufficient knowledge to assist the jurors in deciding the particular issue." *Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999). Further, "[w]hether a witness is qualified to testify as an expert is left to the sound discretion of the trial judge, who is in the best position to determine both the claimed expertise of the witness and the helpfulness of his testimony." *Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129, 1135 (5th Cir. 1985). Although an expert need

not have specialization in every area in which he will be called to testify, Rule 702 nevertheless requires that the expert be qualified in the relevant field.

A review of Mr. Sharma's *curriculum vitae*, deposition testimony, and testimony at the evidentiary hearing demonstrates that he is not qualified to testify as an expert witness in the fields in which he has been offered. First, Mr. Sharma's background almost exclusively has involved preparing for and resolving hazardous waste matters for commercial and industrial facilities. Mr. Sharma has never worked on sewerage systems pertaining to apartment complexes or multi-family residential communities. (Doc. 198 at pp. 35-36). Nor does Mr. Sharma have experience in remediation of third-party property for fecal coliform, pollutants, or contaminants that have impacted surface water. (Doc. 198 at pp. 36-39). Thus, the types of properties that Mr. Sharma has evaluated over the course of his career differs substantially from the property at issue in this case. Further, Mr. Sharma only has been qualified as an expert on one occasion prior to being offered as an expert in this case. Although the Court does not consider the number of times Mr. Sharma has been qualified as an expert witness as a demerit against his qualifications to testify in this case, the Court notes that his prior trial testimony concerned soil contamination by organic constituents, compounds with different biological properties from the constituents of concern in this case.

Mr. Sharma's educational and professional background is impressive. However, outside of his work of conducting routine site assessments and drafting permitting applications for various commercial and industrial properties, Mr.

Sharma lacks the sort of qualifications that would distinguish him as an expert specifically qualified to offer helpful testimony regarding the current state of the Cedar Lodge property. Accordingly, the Court finds that Mr. Sharma is not qualified to testify as an expert in this case, and he will not be allowed to offer testimony as an expert witness.

### 2. *Dismissal of Claims Against STS*

Cedar Lodge also filed a Motion asking the Court to reconsider the portion of the Dispositive Motion Ruling granting Sewer Treatment Specialists, LLC,'s ("STS") Motion for summary judgment. First, Cedar Lodge contends that pursuant to Federal Rule of Civil Procedure 56(f), Cedar Lodge should have been given an opportunity to address the grounds upon which the Court granted summary judgment, namely, whether STS breached any duty it owed to Cedar Lodge. (Doc. 231-1 at p. 1). Specifically, Cedar Lodge maintains that because STS's motion for summary judgment only addressed whether STS had a contractual or legal *duty* to Cedar Lodge and whether there was evidence that STS knew or should have known about any discharges, those were the only challenges addressed in its memorandum in opposition, thereby rendering the Court's grant of summary judgment on the question of legal *breach* inappropriate. (*Id.* at pp. 4-6). Further, Cedar Lodge argues that there is enough evidence for a fair-minded jury to hold STS liable for several reasons, which would warrant the Court's denial of STS's motion for summary judgment. (*Id.* at p. 1). In making this argument, Cedar Lodge appended to its motion a declaration completed by Mr. Ronald Ferris on December 30, 2016. In the declaration, Mr. Ferris

14

offers additional opinions regarding the service and maintenance requests completed by Fairway View and reviewed by the Court when considering STS's motion for summary judgment. (Doc. 232 at p. 2).

STS counters that Cedar Lodge did, in fact, have notice that legal breach was a ground upon which the Court might grant summary judgment and that Cedar Lodge itself argued that STS breached the duty it owed to Cedar Lodge in its opposition to STS's motion for summary judgment. (Doc. 232 at pp. 1-2). STS further argues that Cedar Lodge has not provided any adequate grounds upon which the Court may grant reconsideration because Cedar Lodge's Motion "regurgitates the same, unsuccessful arguments made in opposition to STS's Motion for Summary Judgment and represents nothing more than an attempt to get a second bite at the apple." (*Id.* at p. 2). STS also challenges the inclusion of Mr. Ferris's new declaration.

At the outset, the Court is not persuaded by Cedar Lodge's assertions regarding the applicability of Rule 56(f). As STS noted and as this Court independently finds, the Court did not rule on the "breach issue" *sua sponte*, but rather based its ruling on STS's assertion of "no liability," which the Court interpreted to mean no *negligence*. Further, and contrary to Cedar Lodge's assertion otherwise, Cedar Lodge did address in its memorandum in opposition to STS's motion for summary judgment whether STS breached its duty to make repairs pursuant to the contract it had with Fairway View. (*See* Doc. 139 at p. 3-7). The grounds upon which the Court granted STS's motion for summary judgment were fully briefed by both parties, and no further briefing was required. Thus, the Court finds that Cedar

15

Lodge had ample notice that STS's liability – including whether it breached any duty owed to Cedar Lodge – was at issue and ripe for ruling on summary judgment.

In any event, the Court finds no reason to reconsider its finding that STS did not act unreasonably in maintaining Fairway View's sewerage system. That is, although the lift station required several repairs within a short amount of time, there is no evidence that STS acted unreasonably in its attempts to repair and maintain the system. Further, the Court is not persuaded by Mr. Ferris's new opinions regarding the reasonableness and timeliness of the repairs made by STS. In his declaration, Mr. Ferris opines that "[t]he service records, testimony, invoices, quotes, and other evidence make clear that STS failed to use reasonable care in the operation and maintenance of the lift station, and in its other work around the system" and that "this negligence was a substantial cause of many of the discharges from the system, which end up draining into the Cedar Lodge pond." (Doc. 231-9 at ¶ 15). First, the aforementioned statements in Mr. Ferris's declaration amount to legal conclusions on whether STS negligently serviced Fairway View's sewerage system. Thus, the Court will not consider those opinions. *See Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) (noting that "to allow an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant"). Further, this testimony substantially contradicts statements in Mr. Ferris's expert report and upon which the Court relied in originally finding that STS did not act unreasonably in repairing and maintaining Fairway View's sewerage

system.[6] (*See* Doc. 219 at p. 19). On this basis, the Court will not consider Mr. Ferris's declaration.

Accordingly, because Cedar Lodge has failed to present new evidence or to otherwise demonstrate that the Court's previous Ruling is manifestly erroneous, its Motion to reconsider the granting of STS's motion for summary judgment is **DENIED**.

### 3. *Fairway View's Motion to Reconsider*

#### a. Availability of Restoration Damages

In its motion, Fairway View asks that the Court reconsider the portion of the Dispositive Motion Ruling granting summary judgment on Cedar Lodge's claim that the pond on its property is currently contaminated and in need of remediation. (Doc. 225 at p. 1). In its Ruling, the Court held that (1) although Cedar Lodge had no evidence that the pond is currently contaminated and in need of remediation, it might be entitled to restoration of its pond to its former condition, and (2) that Cedar Lodge offered sufficient evidence to avoid summary judgment on its claim of a lost business opportunity. (*See* Doc. 219 at pp. 20-32). Fairway View suggests that because Cedar Lodge has no witnesses or other evidence to prove what steps, if any, are necessary to restore the property to its former condition or how much that restoration would cost, it is entitled to summary judgment on Cedar Lodge's claim for restoration of its

---

[6] As noted in the Court's Dispositive Motion Ruling, Mr. Ferris opined in his expert report that "many (most) of the problems occurring repeatedly [in the sewerage system] were not correctable using maintenance methodologies"; rather, the entire sewerage system required a complete overhaul. *See* Doc. 131-15 at pp. 7, 13. On that basis, and considering other evidence in the record, the Court found that STS was not authorized by Fairway View to perform the repairs necessary to fix the sewerage system, nor was there evidence that STS failed to exercise reasonable care when it made repairs or carried out its obligations under its contract with Fairway View. Doc. 219 at pp. 19-20.

property. (Doc. 225-1 at pp. 3-6). Further, Fairway View reurges that because Cedar Lodge was the *sole* actor responsible for the breakdown in negotiations that form the basis for its lost business opportunity claim, the Court should reconsider its denial of summary judgment on that point. (*Id.* at pp. 6-7).

Cedar Lodge counters that it is rightfully entitled to restoration of its property to the extent it can prove that the condition of its property has worsened, which it claims it can do. (Doc. 239 at pp. 2-6). Further, Cedar Lodge maintains that because there is a factual dispute about whether Cedar Lodge was the "sole" cause of the development deal's collapse, summary judgment on this claim is inappropriate. (*Id.* at pp. 7-9).

Under Federal Rule of Civil Procedure 54, a district court has "the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *See Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. 1981). Upon reviewing the evidence, the Court finds that Fairway View has identified sufficient cause for the Court to reconsider its Dispositive Motion Ruling.

At the outset, the Court is not persuaded by Fairway View's reliance on *Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Co.*, 618 So. 2d 874 (La. 1993), for the proposition that in order to recover in a restoration claim, Cedar Lodge must prove: (1) the cost of restoration; (2) that the cost of restoration is not disproportionate to the value of the property; (3) if the cost is disproportionate to the value of the property, that Cedar Lodge has some personal interest in restoring the property; and (4) that Cedar Lodge will, in fact, restore the

property. (Doc. 225-1 at p. 4). However, as Cedar Lodge noted, these factors are only relevant upon Cedar Lodge's proving that it sustained property damage and that such damage was caused by Fairway View. *See Archdiocese of New Orleans*, 618 So. 2d at 879-80.

As alluded to in the Ruling and Order addressing the potential viability of Cedar Lodge's restoration claim, the Court was not, at the summary judgment stage, charged with assessing (1) whether Cedar Lodge may ultimately prevail in seeking damages for restoration of its property or (2) the damages to which Cedar Lodge might be entitled should it prevail in its claim. The Court's analysis was limited to whether Cedar Lodge offered enough evidence such that a reasonable jury might find that it is entitled to restoration of its property. Under Louisiana law, this would require that Cedar Lodge offer actual evidence that the property was damaged, among other elements of proof. In the Dispositive Motion Ruling, the Court highlighted Mr. Witter's testimony regarding his observations of the state of the pond, namely, his deposition testimony, wherein he indicated a progressive physical deterioration of his property. (*See* Doc. 138-10 at ¶ 6; Doc. 138-11 at ¶¶ 5-7). This, however, is insufficient as a matter of law to prove actual damage to the property that would trigger the availability of restoration damages. Although Mr. Witter's testimony and statements regarding his personal observations of the physical changes in his property may indicate that the pond's condition changed over time, this in no way proves that the property was damaged to the point that restoration of the property is required. Accordingly, the Court finds that it was manifestly

erroneous to partially deny Fairway View's Motion for summary judgment on Cedar Lodge's restoration claim. Therefore, Fairway View's motion for reconsideration of Cedar Lodge's restoration claim is **GRANTED**, and Cedar Lodge's claim for restoration of its property is **DISMISSED**.

> b.  Availability of Lost Business Opportunity Claim

Fairway View also disputes the Court's denial of summary judgment on its Motion regarding Cedar Lodge's claim for damages resulting from an alleged lost business opportunity. The Court previously held that Cedar Lodge presented sufficient evidence such that a fair-minded jury might conclude that any alleged contamination in December 2012 played a role in the breakdown in negotiations between Cedar Lodge and Harvest Partners and that Cedar Lodge presented sufficient evidence of proof of losses under Louisiana law. (Doc. 219 at pp. 31-32). In re-urging its position, Fairway View emphasizes that Cedar Lodge has offered no evidence (1) that Harvest Partners contributed to the breakdown in the development deal or (2) that in halting the development deal, Mr. Witter was concerned about the effect that the alleged contamination might have on the proposed project.

In response, Cedar Lodge cites the following to demonstrate that there is a dispute regarding the role that the alleged contamination played in the breakdown of the development deal: (1) an interrogatory response in which Cedar Lodge states that "[t]he related environmental concerns were significant to the project developers as the pond was going to be a focal point of the development"; (2) testimony from Mr. Witter indicating that the potential cost to remedy the alleged contamination was a

factor that he considered in halting negotiations with Harvest Partners; (3) Mr. Witter's assertions that Fairway View's failure to remedy the alleged flow of sewage from its property into the Cedar Lodge pond put the development negotiations at an "impasse"; (4) testimony of Mr. Wilson LaGraize, an expert retained by Cedar Lodge to testify about the financial losses associated with the failed development deal, in which he opined that "no one wants to go to a project where you have the threat of contamination. . . . It's too risky to expose yourself to that"; and (5) testimony of Eliot Barnett, Harvest Partner's corporate representative, who says that development negotiations "had to stop" because of "an environmental issue." (Doc. 239 at pp. 7-9).

Upon reviewing the evidence cited by Cedar Lodge in support of its Motion, including evidence previously cited by Fairway View in support of its original Motion for summary judgment, the Court finds that Cedar Lodge has not offered sufficient evidence to attribute Mr. Witter's unilateral cessation of communications to anyone or anything other than himself. First, the Court finds that the overwhelming weight of the evidence demonstrates that Mr. Witter *alone* elected not to proceed in negotiating with Harvest Partners regarding the development of the subject property, despite Harvest Partners' willingness to resolve the issues presented by the alleged contamination and to proceed with the development project. Most notably, the corporate deposition of Harvest Partners' representative, Mr. Barnett, makes clear that despite Harvest Partners' efforts to solve the alleged contamination problem, whether the development deal would proceed "was out of [Harvest Partners'] hands." (Doc. 121-5 at p. 60, ll. 1-11). Further, correspondence between Blaine Lee, another

Harvest Partner representative, and Mr. Witter demonstrates a willingness on the part of Harvest Partners to proceed with any potentially necessary remediation plan and development of the property. (Doc. 138-13). However, this willingness was met with silence on the part of Cedar Lodge, which led to frustration on the part of Harvest Partners. (Doc. 121-5 at pp. 60-61). Accordingly, the evidence in the record makes clear that of the two primary parties participating in the development of the Cedar Lodge property, Mr. Witter *alone*, as Cedar Lodge's corporate representative, was responsible for the breakdown in negotiations and the ultimate cessation of any development plans.

Further, the evidence submitted by Cedar Lodge to demonstrate that the alleged contamination was a substantial factor in the breakdown of negotiations is not persuasive. As noted, the bulk of the evidence cited by Cedar Lodge is the uncorroborated, self-serving testimony of its corporate representative, which would not have been enough to preclude summary judgment, particularly because the overwhelming documentary evidence available in the record supports the opposite scenario, namely, that the development deal could have proceeded notwithstanding the alleged contamination issues. *See In re Buescher*, 783 F.3d 302, 308 (5th Cir. 2015) (citing *Vinewood Capital, LLC v. Dar Al-Maal Al-Islami Tr.*, 541 F. App'x 443, 447-48 (5th Cir. 2013). The only evidence supporting the proposition that Mr. Witter halted the development deal because of the alleged contamination is Mr. Witter's testimony. In contrast, as outlined above, the record is replete with documentary evidence and testimony that the potential problems associated with the alleged

contamination was not enough to discourage Harvest Partners from proceeding with the development of the Cedar Lodge property.[7]

There is insufficient evidence in the record to attribute the failure of the development project to anyone other than Mr. Witter. For this reason, and for reasons stated above, Fairway View's motion for reconsideration is **GRANTED** and Cedar Lodge's claim for lost business opportunity is **DISMISSED**.

## III.   MOTION FOR ENTRY OF A FINAL JUDGMENT

Cedar Lodge filed a motion requesting that the Court direct the entry of a final judgment under Rule 54(b) as to the Dispositive Motion Ruling granting STS's motion for summary judgment and granting in part and denying in part Fairway View's motion for summary judgment, arguing that there is "no just reason for delay." (Doc. 224 at pp. 2-3). Cedar Lodge also requests that the Court stay these proceedings pending resolution of the issues. (Doc. 224).

Rule 54(b) provides, in pertinent part:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon

[7] This finding is true notwithstanding Cedar Lodge's reference to additional evidence in the record, which it argues supports its assertion that the alleged contamination factored in to Mr. Witter's decision to halt negotiations. Specifically, Mr. LaGraize's statement that "no one wants to go to a project where you have the threat of contamination" does not adequately explain why Mr. Witter himself failed to pursue the project with Harvest Partners. Further, the statements made by Mr. Barnett during Harvest Partners' corporate deposition do not accurately depict the narrative surrounding Harvest Partners' position during negotiations with Cedar Lodge. That is, as the Court appreciates Mr. Barnett's statements, Mr. Barnett did not testify that Harvest Partners became independently aware of "environmental issues" on the Cedar Lodge property and decided to stop project negotiations. Rather, Mr. Barnett's testimony is consistent with the other evidence in the record in that it indicates that Harvest Partners became aware of the alleged contamination through Mr. Witter who, without explicitly communicating that the nature of the contamination required that negotiations between Harvest Partners and Cedar Lodge stop, ceased communicating altogether.

> an express determination that there is no just reason for
> delay and upon an express direction for the entry of
> judgment.

Fed. R. Civ. P. 54(b). The Fifth Circuit has noted that "[o]ne of the primary policies behind requiring a justification for Rule 54(b) certification is to avoid piecemeal appeals." *PYCA Indus., Inc. v. Harrison Cty. Waste Mgmt.*, 81 F.3d 1412, 1421 (5th Cir. 1996). Further, the Fifth Circuit has explained that Rule 54(b) judgments are not favored and should be awarded only when necessary to avoid injustice: "A district court should grant certification [pursuant to Rule 54(b)] only when there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal; it should not be entered routinely as a courtesy to counsel." *Id.* (citing *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 445 (2d Cir. 1985)).

The threshold inquiry for a district court, then, is whether "there is no just reason for delay," a determination that is within the sound discretion of the district court. *See Ackerman v. FDIC*, 973 F.2d 1221, 1224 (5th Cir. 1992). In making this determination, the district court has a duty to weigh "the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other." *Road Sprinkler Fitters Local Union v. Cont'l Sprinkler Co.*, 967 F.2d 145, 148 (5th Cir. 1992) (quoting *Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 511 (1950)) (internal citations omitted). A major factor that the district court should consider is whether the appellate court "would have to decide the same issues more than once even if there were subsequent appeals." *H & W Indus., Inc. v. Formosa*

*Plastics Corp., USA*, 860 F.2d 172, 175 (5th Cir. 1988) (quoting *Curtiss–Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980)).

The Court finds that certification for immediate appeal is inappropriate at this stage. As both parties have noted, this litigation has been ongoing for over four years, which has put this case in a procedural posture such that should the Court grant the entry of final judgment at this stage, piecemeal review by the Fifth Circuit would be inevitable. The Court thus finds that no just reason for delay exists. Accordingly, Cedar Lodge's Motion to certify the Court's Ruling and Order of December 21, 2016, is **DENIED**.

## IV.    MOTION TO CERTIFY FOR INTERLOCUTORY APPEAL

Finally, Cedar Lodge asks the Court to certify for interlocutory review, pursuant to 28 U.S.C. § 1292(b) and Federal Rule of Appellate Procedure 5(a)(3), the portion of the *Daubert* Ruling that limits Mr. Sharma's testimony. (Doc. 224).

To certify a ruling for interlocutory appeal, "the court must find that the interlocutory decision (1) involves a controlling question of law as to which (2) there is a substantial ground for difference of opinion and (3) that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *La. Generating, L.L.C. v. Ill. Union Ins. Co.*, Nos. 10-cv-516-JJB-SCR, 10-cv-835-JJB-DLD, 2012 WL 1752685, at *1 (M.D. La. May 16, 2012) (citing 28 U.S.C. § 1292(b)). The Fifth Circuit strictly construes the requirements of Section 1292(b). *Ala. Labor Council v. Alabama*, 453 F.2d 922, 924 (5th Cir. 1972). "[R]esolution of an issue need not necessarily terminate an action in order to be controlling . . . . Whether an issue

of law is controlling usually 'hinges upon its potential to have some impact on the course of the litigation.'" *United States v. La. Generating L.L.C.*, No. 09-cv-100-JJB, 2012 WL 4588437, at *1 (M.D. La. Oct. 2, 2012) (internal citations omitted). A substantial ground for difference of opinion "usually only arises out of a genuine doubt as to the correct applicable legal standard relied on in the order." *Prop. One, Inc. v. US Agencies, L.L.C.*, 830 F. Supp. 2d 170, 182-83 (M.D. La. 2011).

### A. Controlling Question of Law

Cedar Lodge argues that there are two controlling questions of law relevant to the *Daubert* Ruling that warrant certification:

> **Controlling Question of Law #1:** In an environmental contamination case, may an expert testify, pursuant to *Daubert*, regarding his conclusion as to Step One of a sampling review process (which determines the total concentration level of contaminants), even if Step Two of the review process has not been completed?

> **Controlling Question of Law #2:** In an environmental contamination case, is it "misleading," under Rule 403 and *Daubert*, for an expert to present his conclusion that there is a trend of higher contamination data points closer to a potential source of contamination if some of the charts that the expert made to support his argument do not include every single data point?

(*See* Doc. 223-1 at pp. 7, 13). First, the Court notes that Cedar Lodge is not required to identify the precise questions for which it seeks review, as district courts do not certify "questions" for the court of appeals upon the grant of a Section 1292(b) motion. *See Linton v. Shell Oil Co.*, 563 F.3d 556, 557 (5th Cir. 2009) ("[S]ection 1292(b) authorizes certification of orders for interlocutory appeal, not certification of questions."). In any event, assuming the *Daubert* Ruling presented controlling

questions of law suitable for interlocutory review by the Fifth Circuit, the Court finds that there exists no "substantial ground for difference of opinion."

## B.    Substantial Ground for Difference of Opinion

Without providing much explanation, Cedar Lodge argues that there is a substantial ground for difference of opinion on the questions presented in its Motion. (*See* Doc. 223-1 at pp. 10-13). A substantial ground for difference of opinion "usually only arises out of a genuine doubt as to the correct applicable legal standard relied on in the order." *Prop. One,* 830 F. Supp. 2d at 182-83. Disagreement with the district court's ruling is insufficient to establish a substantial ground for a difference of opinion. *Ryan v. Flowserve Corp.,* 444 F. Supp. 2d 718, 724 (N.D. Tex. 2006).

Cedar Lodge's empty assertions regarding the existence of substantial grounds for difference of opinion are insufficient to meet this prong of Section 1292(b). Cedar Lodge merely relies on abstract arguments concerning a potential disagreement on the ultimate determination of the admissibility of certain aspects of Mr. Sharma's testimony and report; Cedar Lodge fails to identify concrete disagreement on the issues identified. Because the Fifth Circuit strictly construes the requirements of Section 1292(b), Cedar Lodge's arguments are insufficient to satisfy the requirements for interlocutory appeal under Section 1292(b). Therefore, Cedar Lodge's request that the Court certify for interlocutory review its Ruling and Order addressing Mr. Sharma's proposed testimony is **DENIED**.

## V.    MOTIONS IN LIMINE FILED BY FAIRWAY VIEW

Finally, Fairway View has filed Motions to exclude evidence and testimony regarding (1) the alleged cost to drain the pond on Cedar Lodge's property and (2) any evidence of alleged sewage discharges that occurred after January 29, 2013. (Docs. 229, 236). These motions were filed in response to the Dispositive Motion Ruling and the *Daubert* Ruling, (*see* Docs. 219, 222), in which the Court curtailed the scope of triable issues by dismissing Cedar Lodge's claim for remediation of its property and by limiting the testimony of Cedar Lodge's environmental expert, Mr. Sharma. As a result of these Rulings, Fairway View asserts that any evidence of potential costs to drain the pond would be irrelevant because it is borne out of Mr. Sharma's TCLP testimony, which this Court previously ruled would not be admissible at trial. (Doc. 229 at pp. 3-4). Fairway View also argues that any evidence of post-January 29, 2013, discharges should be excluded as irrelevant to the remaining claims.    Further, Fairway View argues that even if the Court finds that post-January 29, 2013, evidence and testimony is relevant, such evidence should be excluded under Rule 403 because it would serve no purpose other than to prejudice Fairway View, confuse the issues before the jury, and waste time. (*See* Doc. 236 at pp. 3-6).

In response, Cedar Lodge argues that the Motions should be denied as untimely submitted by Fairway View. (*See* Doc. 246 at p. 2). Cedar Lodge also asserts that (1) evidence of costs to drain the pond is relevant to its restoration claim (Doc. 244) and (2) evidence of post-January 29, 2013, discharges is relevant to Cedar

Lodge's allegations that Fairway View's tortious conduct is continuous and does not confuse the issues, waste time, or unfairly prejudice Fairway View. (*See* Doc. 246 at pp. 3-10).

As an initial matter, the Court agrees that Fairway View's Motions are untimely. The Court's Scheduling Order imposed a deadline for the submission of motions *in limine* of September 23, 2016, (*see* Doc. 125 at ¶ H), and Fairway View's Motions were filed on December 29, 2016, and January 5, 2017, respectively, (*see* Docs. 229, 236). Nevertheless, because the evidentiary objections presented in Fairway View's Motions did not arise until after the Court entered the Dispositive Motion Ruling and the *Daubert* Ruling, the Court will consider the Motions.

First, contrary to Fairway View's assertions of irrelevance, evidence of post-January 29, 2013, discharges is probative of whether the alleged tortious conduct is "continuous" as Cedar Lodge has consistently asserted. (*See* Doc. 50 at ¶¶ 9, 15). A finding of "continuous" discharges over time would be a basis upon which the Court might award any warranted equitable relief and upon which the jury might award monetary relief for Cedar Lodge's damages. Additionally, the Court is not inclined to exclude such broadly described evidence without considering how such a broad exclusion would prejudice Cedar Lodge's ability to prove its claims. Accordingly, the Court declines to exclude *all* evidence of post-January 29, 2013, discharges. To the extent Fairway View believes evidentiary objections are warranted for specific items at trial, the Court will consider those objections at that time.

However, although Fairway View's representations of the cost estimates to drain the pond offered by Mr. Sharma are misleading,[8] the Court finds that all such estimates must be excluded in light of the portion of this Ruling disqualifying Mr. Sharma from testifying as an expert witness in this case. Additionally, to the extent such corrective measures bear on Cedar Lodge's ability to prove its claim for restoration of its pond, the cost estimates for removal and disposal of pond water are now irrelevant because the Court has dismissed Cedar Lodge's restoration claim.

## VI. CONCLUSION

Accordingly,

**IT IS ORDERED** that the **Motion for Reconsideration or, Alternatively, Motion to Amend (Doc. 223)** filed by Cedar Lodge is **DENIED**.

**IT IS FURTHER ORDERED** that the **Motion for Certificate of Appealability (Doc. 224)** filed by Cedar Lodge is **DENIED**.

**IT IS FURTHER ORDERED** that the **Motion for Reconsideration Pursuant to Federal Rule of Civil Procedure 54(b) (Doc. 225)** filed by Fairway View is **GRANTED**. Therefore, pursuant to Federal Rule of Civil Procedure 56, Cedar Lodge's claims for **restoration of its property** and **lost business opportunity** are **DISMISSED WITH PREJUDICE**.

---

[8] Although Mr. Sharma did opine at the *Daubert* hearing that draining the pond was necessary before he could conduct Step Two of the TCLP process, (*see* Doc. 199 at p. 101), Mr. Sharma offered the disputed figures in his original expert report, well before mentioning the TCLP standards and procedures at his deposition. In his report, Mr. Sharma concluded that "[a]ppropriate corrective measure[s] will be evaluated following draining of the lake." (Doc. 244-3 at p. 22).

IT IS FURTHER ORDERED that the **Motion for Reconsideration on Order Granting STS's Motion for Summary Judgment (Doc. 231)** filed by Cedar Lodge is **DENIED**.

IT IS FURTHER ORDERED that Suresh Sharma, Cedar Lodge's proposed expert, is hereby **DISQUALIFIED** from testifying as an expert at trial.

IT IS FURTHER ORDERED that the **Motion in Limine to Exclude Evidence and Testimony Regarding the Alleged Cost to Drain the Pond (Doc. 229)** filed by Fairway View is **GRANTED IN PART** and **DENIED AS MOOT IN PART**.

IT IS FURTHER ORDERED that the **Motion in Limine to Exclude Evidence and Testimony Regarding Alleged Sewage Discharges After January 29, 2013 (Doc. 236)** filed by Fairway View is **DENIED**.

IT IS FURTHER ORDERED that the **Motions for Expedited Hearing (Docs. 226, 227, 230, 237)** and the **Motion for Oral Argument (Doc. 228)** filed by the parties are **DENIED**.

Baton Rouge, Louisiana, this _6th_ day of September, 2017.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**